939 A.2d 796

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT
v. SULAIMAN A. SLOANE, DEFENDANT–
RESPONDENT.

Argued September 24, 2007—Decided February 11, 2008.

424

*Paul H. Heinzel,* Deputy Attorney General, argued the cause for appellant (*Anne Milgram,* Attorney General of New Jersey, attorney).

*Robert Carter Pierce,* Designated Counsel, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Chief Justice RABNER delivered the opinion of the Court.

The police properly stopped a motor vehicle after confirming that its driver did not have a valid license. They later ran a check on the passenger in the National Crime Information Center (NCIC) database, which resulted in his arrest on outstanding warrants. Police found crack cocaine on him during a search incident to arrest.

We hold that at the time of the stop, the passenger, like the driver, was seized under the federal and state constitutions. We also hold that police do not need reasonable suspicion before they may access the NCIC database. Because the decision to check the NCIC database was within the scope of the traffic stop and did not unreasonably prolong the stop, there was no basis to suppress the evidence found.

We therefore reverse the judgment of the Appellate Division and reinstate defendant's conviction and sentence.

## I.

Around midnight on November 11, 2003, Sherma Moore was driving a car registered to Therron Carmichael. Defendant Sulaiman Anwar Sloane, who is Carmichael's nephew, was a passenger in the car. Officer Muzyka of the Carteret Police Department spotted Moore driving. From a prior incident, the officer thought Moore's license was suspended. The officer positively identified Moore from his patrol car, called headquarters to confirm her license was suspended, and then activated his overhead lights.

Moore pulled into a parking spot across from Carmichael's residence. According to Officer Muzyka, both Moore and Sloane quickly jumped out of the car and approached the officer. Out of a concern for his own safety, the officer ordered Moore and Sloane back into the car. Both complied. The officer then asked Moore for her credentials, reconfirmed her license was suspended, ran the information through the NCIC database, found a warrant for her arrest, and arrested her.

According to the officer, as he led Moore away from the vehicle, Sloane asked for the car keys to take to his uncle. The officer recalled that Moore said she did not want Sloane to have the keys. Before surrendering the keys to Sloane, the officer wanted to confirm that he was a licensed driver, in case he chose to drive away. In response to questioning, Sloane advised he did not have his driver's license with him but offered his name, date of birth, and social security number. Officer Muzyka entered this informa-

tion into the motor vehicle database and learned that Sloane had a suspended license.

Either Officer Muzyka or Officer Simback—who was also at the scene and heard Sloane identify himself—ran Sloane's name through the NCIC database. (The record is unclear about who actually performed the check, but that factual issue is not significant.) There is no evidence that the NCIC check materially prolonged the length of the stop. The database revealed a parole violation and two outstanding warrants. Based on that information, Officer Muzyka arrested Sloane. In a search incident to arrest at police headquarters, police found crack cocaine in Sloane's shoe.

Sloane's account of events differed from the officer's in certain respects. The motion judge credited Officer Muzyka's testimony after a suppression hearing, and we accordingly rely on that testimony in reciting the applicable facts.

A Middlesex County grand jury indicted Sloane for third-degree possession of a controlled dangerous substance (CDS) (*N.J.S.A.* 2C:35-10a(1)), third-degree possession of CDS with intent to distribute (*N.J.S.A.* 2C:35-5a(1), -5b(3)), third-degree possession of CDS with intent to distribute on or near school property (*N.J.S.A.* 2C:35-7), and second-degree possession of CDS with intent to distribute on or near a public park (*N.J.S.A.* 2C:35-7.1).

Sloane filed a motion to suppress the drugs found on him. After a pre-trial hearing at which Officer Muzyka and Sloane testified, the court denied the motion. The court ruled that the initial stop of the vehicle was valid and that Officer Muzyka had the right to order Sloane back into the car for the officer's safety. Once Sloane asked for the keys, the court concluded, the police had an obligation to inquire further to insure it would be appropriate to give Sloane the keys.

Sloane pled guilty to third-degree possession of CDS, pursuant to a plea agreement. The court sentenced him to three years'

imprisonment with no period of parole ineligibility, to run concurrently with a sentence for a violation of parole.

Sloane appealed. In an unpublished opinion, the Appellate Division reversed the denial of his motion to suppress, vacated the judgment of conviction, and remanded for further proceedings. First, the panel ruled that Sloane was seized under the Fourth Amendment when the police validly stopped Moore. The panel reasoned that passengers usually have no means of leaving the scene and are thus subject to the same temporary detention as the driver of a detained vehicle. Next, the panel found no error in the officer ordering Sloane back into the car as a safety precaution and then verifying whether Sloane had a valid driver's license before handing him the car keys.

However, the panel concluded that "once defendant gave his name, along with his correct birth date and social security number, and once the officer learned that defendant's license was suspended, the justification for defendant's detention ended." Absent a "reasonable or articulable suspicion that defendant was engaged in any wrongdoing," the panel found it was impermissible to search the NCIC database and further investigate him. Instead, the panel noted that the police could have secured the car and located its owner to prevent it from being driven by someone not authorized to drive. Without the results of the NCIC check, Sloane would not have been arrested and searched. Accordingly, the panel concluded that the evidence found on Sloane following his arrest should have been suppressed.

This Court granted the State's petition for certification. 188 *N.J.* 490, 909 *A.*2d 725 (2006).

## II.

The State contends that the Appellate Division committed two errors in suppressing the crack cocaine found on Sloane. First, the State asserts that Sloane, as a passenger, was not seized when police stopped the car and investigated Moore, the driver. The State submits that Sloane was free to leave during the car stop.

Second, the State argues that accessing public records maintained in the NCIC database does not implicate the Fourth Amendment unless that check unreasonably prolongs a stop. As a result, police do not need reasonable and articulable suspicion to access the NCIC database.

Sloane maintains that the Appellate Division properly suppressed the evidence. He argues that he was seized because a reasonable person in his position would not have felt free to walk away from the police encounter, particularly once the officer ordered him back to the car. Sloane also submits that his detention should have ended when the police discovered that he had a suspended license. According to Sloane, the police needed (and lacked) reasonable and articulable suspicion to expand their inquiry and conduct an NCIC check.

We turn first to whether Sloane was seized by virtue of being a passenger in a car stopped by the police.

### III.

The Fourth Amendment of the United States Constitution and Article 1, paragraph 7 of the New Jersey Constitution protect against unreasonable searches and seizures. A seizure occurs if, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." *State v. Stovall,* 170 *N.J.* 346, 355, 788 *A.*2d 746 (2002) (alteration in original) (quoting *United States v. Mendenhall,* 446 *U.S.* 544, 554, 100 *S.Ct.* 1870, 1877, 64 *L.Ed.*2d 497, 509 (1980)). Another way to measure the coercive nature of the encounter is "by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Brendlin v. California,* —— *U.S.* ——, 127 *S.Ct.* 2400, 2405–06, 168 *L.Ed.*2d 132 (2007) (quoting *Florida v. Bostick,* 501 *U.S.* 429, 436, 111 *S.Ct.* 2382, 2387, 115 *L.Ed.*2d 389, 400 (1991)).

■ Temporary detention during an investigatory traffic stop, even if brief and limited, constitutes a "seizure" of "persons." *State v. Dickey*, 152 *N.J.* 468, 475, 706 *A.*2d 180 (1998) (citing *Whren v. United States*, 517 *U.S.* 806, 809, 116 *S.Ct.* 1769, 1772, 135 *L.Ed.*2d 89, 95 (1996)). As a result, when a police officer makes a traffic stop, the vehicle's driver is plainly seized. The question before this Court for the first time is whether a passenger is seized as well.

The United States Supreme Court recently addressed this precise issue under federal law. In *Brendlin v. California, supra*, the Court held that a passenger of a car is seized for purposes of the Fourth Amendment when a police officer makes a traffic stop. —— *U.S.* at ——, 127 *S.Ct.* at 2403, 168 *L.Ed.*2d at 136.

Defendant Brendlin was a passenger in a car stopped by the police. *Id.* at ——, 127 *S.Ct.* at 2404, 168 *L.Ed.*2d at 136. During the course of the stop, the police recognized Brendlin and verified that he was wanted for a parole violation. *Ibid.* Police arrested him on an outstanding warrant and, based on items found on him and in the car, charged Brendlin with possession and manufacture of methamphetamine. *Id.* at ——, 127 *S.Ct.* at 2404, 168 *L.Ed.*2d at 137. Brendlin moved to suppress the evidence seized. *Ibid.* The California Supreme Court upheld the denial of that motion finding that, although the initial traffic stop was unlawful, Brendlin was not seized as a constitutional matter. *Id.* at ——, 127 *S.Ct.* at 2404–05, 168 *L.Ed.*2d at 137.

As the starting point for its analysis, the United States Supreme Court asked "whether a reasonable person in Brendlin's position when the car stopped would have believed himself free 'to terminate the encounter' between the police and himself." *Id.* at ——, 127 *S.Ct.* at 2406, 168 *L.Ed.*2d at 139 (citation omitted). The Court reasoned that a traffic stop restrains a passenger's freedom to travel just as much as it does the driver's and that police activity during a stop "does not normally ... distinguish between passenger and driver." *Id.* at ——, 127 *S.Ct.* at 2407, 168 *L.Ed.*2d at 139–40. Thus, "a sensible person would not expect a police

officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or wrongdoing." *Id.* at ——, 127 *S.Ct.* at 2407, 168 *L.Ed.*2d at 140. The Court noted that "even when the wrongdoing is only bad driving, the passenger will expect to be subject to some scrutiny, and his attempt to leave the scene would be so obviously likely to prompt an objection from the officer that no passenger would feel free to leave in the first place." *Ibid.* Furthermore, a passenger would reasonably expect that "a police officer ... [would] not let people move around in ways that could jeopardize [the officer's] safety." *Ibid.*

In addition, as a practical matter, passengers in a car stopped for a traffic violation usually have no alternative means of transportation and are thus subject to the same temporary stop. *State v. Hickman,* 335 *N.J.Super.* 623, 634, 763 *A.*2d 330 (App.Div.2000); *see also Maryland v. Wilson,* 519 *U.S.* 408, 413–14, 117 *S.Ct.* 882, 886, 137 *L.Ed.*2d 41, 47 (1997).

■ All of those reasons lead to the conclusion that when a police officer conducts a traffic stop of a private vehicle, the passenger as well as the driver are seized under both the federal and state constitutions. That holding is consistent with the majority of state court rulings on the issue. *See State v. Bowers,* 334 *Ark.* 447, 976 *S.W.*2d 379, 380–82 (1998); *State v. Haworth,* 106 *Idaho* 405, 679 *P.*2d 1123, 1124 (1984); *People v. Bunch,* 207 *Ill.*2d 7, 277 *Ill.Dec.* 658, 796 *N.E.*2d 1024, 1029 (2003), *cert. denied,* 541 *U.S.* 959, 124 *S.Ct.* 1712, 158 *L.Ed.*2d 399 (2004); *State v. Eis,* 348 *N.W.*2d 224, 226 (Iowa 1984); *State v. Hodges,* 252 *Kan.* 989, 851 *P.*2d 352, 361–362 (1993); *State v. Carter,* 69 *Ohio St.*3d 57, 630 *N.E.*2d 355, 360 (1994) (per curiam); *State v. Harris,* 206 *Wis.*2d 243, 557 *N.W.*2d 245, 251 (1996); *see also Hickman, supra,* 335 *N.J.Super.* at 634, 763 *A.*2d 330. *But see People v. Jackson,* 39 *P.*3d 1174, 1184–86 (Colo.2002) (en banc); *State v. Mendez,* 137 *Wash.*2d 208, 970 *P.*2d 722, 729 (1999) (en banc).

Applying that standard, Sloane was seized at the time of the traffic stop. When Officer Muzyka ordered Moore to stop her

vehicle on the suspicion that she was driving with a suspended license, Sloane's travel was curtailed. Sloane then got out of the car, and the officer promptly ordered him to return to it. Sloane complied. Apart from what any reasonable person might have thought, Sloane was, in fact, not free to leave. Although he was a passenger and not the driver, he was temporarily "seized."

■ That determination does not end our inquiry because the ultimate standard in evaluating a seizure is "reasonableness." *See Cady v. Dombrowski*, 413 *U.S.* 433, 439, 93 *S.Ct.* 2523, 37 *L.Ed.*2d 706 (1973). As a seizure, a traffic stop is lawful if it is reasonable. That requirement may be met "where the police have probable cause to believe that a traffic violation has occurred." *Dickey, supra,* 152 *N.J.* at 475, 706 *A.*2d 180 (quoting *Whren, supra,* 517 *U.S.* at 810, 116 *S.Ct.* at 1772, 135 *L.Ed.*2d at 95).

Sloane concedes that the traffic stop of Moore was reasonable. Officer Muzyka stopped Moore's car after confirming that she was driving on a suspended license. Because the car stop was lawful, detaining Sloane at that moment was also valid.

When Sloane and Moore jumped out of the car and approached the officer, he ordered them back into the car. The officer's concerns for his own safety justified that reasonable command. *See State v. Diloreto,* 180 *N.J.* 264, 276, 850 *A.*2d 1226 (2004); *People v. Castellon,* 76 *Cal.App.*4th 1369, 91 *Cal.Rptr.*2d 204, 207–08 (1999), *review denied,* No. S085514, 2000 Cal. Lexis 3298 (Mar. 29, 2000).

Likewise, after Sloane asked for the keys to the car, it was reasonable for the officer to ask Sloane for identification to insure that the car would be driven by a properly licensed driver. *See State v. Pegeese,* 351 *N.J.Super.* 25, 31–32, 796 *A.*2d 934 (App.Div. 2002); *Hickman, supra,* 335 *N.J.Super.* at 635, 763 *A.*2d 330.

Up to this point, we find nothing inappropriate in the conduct of the police. We turn next to whether the check of the NCIC database violated Sloane's constitutional rights. We start with a review of the NCIC system.

## IV.

### A.

The National Crime Information Center is a computerized database of criminal justice information available to law enforcement agencies nationwide. It was designed to help law enforcement locate fugitives and stolen property. As such, the national index includes records on wanted persons and information on stolen property, including vehicles. Today it also contains information on missing persons, unidentified persons, people believed to pose a threat to the President, foreign fugitives, and related areas. Crim. Justice Info. Servs. Div., U.S. Dep't of Justice, National Crime Information Center: An Overview (2005), http:// www.fbi.gov/filelink.html?file=/hq/cjisd/ncic_brochure.pdf. The network also includes electronic transmission of mugshots, photographs, and fingerprints. CJIS Division Homepage, NCIC, http:// www.fbi.gov/hq/cjisd/ncic.htm (last visited Jan. 25, 2008).

Congress first authorized the Attorney General to collect that information in 1966. *See* 28 *U.S.C. A.* § 534. By 2003, NCIC contained more than fifty-two million records. *The FBI's National Crime Information Center: Hearing before the Subcomm. on Immigration, Border Security, and Citizenship of the S. Comm. on the Judiciary,* 108th Cong. (2003) (statement of Michael D. Kirkpatrick, Assistant Director in Charge, Criminal Justice Information Services Division, FBI), *http://www.fbi.gov/congress/ congress03/ncic111303.htm.*

NCIC is available to more than 90,000 local law enforcement and criminal justice agencies twenty-four hours a day, 365 days a year. FBI, NCIC Turns 40: FBI Technology Saving Lives (Jan. 29, 2007), http://www.fbi.gov/page2/jan07/ncic012907.htm. Those agencies regularly access the database. In 2007, there were more than 1.8 billion NCIC queries, with an average of more than five million each day. *See* 40 Years of NCIC (Jan. 24, 2007), *http:// www.fbi.gov/pressrel/pressrel07/ncic012407.htm.*

Underlying those transactions is a concern for the safety of police officers, who are at risk when they approach individuals during a traffic stop. *See United States v. Finke,* 85 *F.*3d 1275, 1280–81 (7th Cir.1996) (finding that concerns for officer safety supported criminal history check during traffic stop). The tragic reality is that "a significant percentage of murders of police officers occurs when the officers are making traffic stops." *Pennsylvania v. Mimms,* 434 *U.S.* 106, 110, 98 *S.Ct.* 330, 333, 54 *L.Ed.*2d 331, 337 (1977) (per curiam) (internal quotations and citation omitted); *see also United States v. McRae,* 81 *F.*3d 1528, 1535–36 n. 6 (10th Cir.1996). In 2005, ten officers throughout the country were killed while conducting traffic stops. FBI, U.S. Dep't of Justice, Law Enforcement Officers Killed and Assaulted, 2005 (2006). In New Jersey alone, more than 250 officers were assaulted during traffic stops in 2006. Office of the Attorney Gen., N.J. Dep't of Law & Pub. Safety, Crime in New Jersey 191 (2007).

## B.

■ To what extent does accessing the NCIC database implicate federal and state constitutional concerns? As the Supreme Court has explained, "[t]he touchstone of Fourth Amendment analysis is whether a person has 'a constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo,* 476 *U.S.* 207, 211, 106 *S.Ct.* 1809, 1811, 90 *L.Ed.*2d 210, 215 (1986) (citation omitted). That test covers both a subjective and an objective expectation of privacy. *State v. Evers,* 175 *N.J.* 355, 369, 815 *A.*2d 432 (2003) (citing *Katz v. United States,* 389 *U.S.* 347, 361, 88 *S.Ct.* 507, 516, 19 *L.Ed.*2d 576, 588 (1967) (Harlan, J., concurring)). In other words, a "reasonable" expectation of privacy encompasses not only an individual's expectation but also society's willingness to recognize that expectation as reasonable. *Ciraolo, supra,* 476 *U.S.* at 211, 106 *S.Ct.* at 1811, 90 *L.Ed.*2d at 215 (citing *Smith v. Maryland,* 442 *U.S.* 735, 740, 99 *S.Ct.* 2577, 2580, 61 *L.Ed.*2d 220, 226–27 (1979)).

While an individual may wish to conceal an outstanding warrant, society takes a very different view. As this Court previously stated in *Doe v. Poritz,* 142 *N.J.* 1, 28 n. 8, 662 *A.*2d 367 (1995), a person "has no reasonable expectation of privacy in his fingerprints, photograph or matters of public record." *See also United States v. Ellison,* 462 *F.*3d 557, 562–63 (6th Cir.2006) (finding that investigation of computerized law-enforcement database was not search), *cert. denied,* —— *U.S.* ——, 128 *S.Ct.* 374, 169 *L.Ed.*2d 258 (2007).

In a related context, this Court has held that law enforcement may conduct random checks of a car's license plate number using a mobile data terminal (MDT).[1] *State v. Donis,* 157 *N.J.* 44, 54–55, 723 *A.*2d 35 (1998). The Court held that "because MDT checks are not traditional searches subject to Fourth Amendment restrictions, they can be 'random,' " and do not have to be "based on reasonable suspicion." *State v. Segars,* 172 *N.J.* 481, 490, 799 *A.*2d 541 (2002) (citing *Donis, supra,* 157 *N.J.* at 48, 54–55, 723 *A.*2d 35).

In *Donis,* the Court found that "[t]he State has a vital and compelling interest in maintaining highway safety by ensuring that only qualified drivers operate motor vehicles and that motor vehicles are in a safe condition" and that "[e]very operator of a motor vehicle must expect that the State, in enforcing its regulations, will intrude to some extent upon that operator's privacy." 157 *N.J.* at 51–52, 723 *A.*2d 35 (internal quotations and citations

---

[1] At the time the Court announced that holding, MDTs were linked to the computerized databases of the New Jersey Division of Motor Vehicles (DMV) (now the Motor Vehicle Commission). A random license plate look-up would reveal information including the registration status of the vehicle, the registered owner's license status, whether the vehicle had been reported stolen, the vehicle identification number, the year, make, model and color of the vehicle, and the name, address, social security number, date of birth, weight, height, and eye color of the registered owner. *Donis, supra,* 157 *N.J.* at 46–47, 723 *A.*2d 35. MDTs were not linked to NCIC's criminal history information, but by entering the licensee's name, an officer could learn if that person was wanted by state or federal authorities. *Id.* at 47, 723 *A.*2d 35.

omitted) (alteration in original). The Court reasoned that because license plate numbers are visible to the public, motorists have no expectation of privacy in them. As a result, the police may randomly search license plate numbers in MDTs to determine a vehicle's registration status, the owner's license status, and whether the vehicle was reported stolen.[2] *Id.* at 55, 723 *A.*2d 35. *See also Diloreto, supra,* 180 *N.J.* at 277, 850 *A.*2d 1226 (finding "no serious question regarding the appropriateness" of officer retrieving data from MDT).

■ Applying those principles, we conclude that an NCIC check is not a search under the federal or state constitutions. Critical to our analysis is the fact that the NCIC database is comprised of matters of public record. *See Willan v. Columbia County,* 280 *F.*3d 1160, 1162 (7th Cir.2002) (finding that "[r]ecords of conviction are public rather than private documents" and, therefore, may be recorded and disseminated by NCIC); *Gist v. Macon County Sheriff's Dep't,* 284 *Ill.App.*3d 367, 219 *Ill.Dec.* 701, 671 *N.E.*2d 1154, 1161 (1996) (noting that existence of arrest warrant is matter of public record), *appeal denied,* 171 *Ill.*2d 564, 222 *Ill.Dec.* 431, 677 *N.E.*2d 965 (1997); *People v. Davis,* 250 *Mich.App.* 357, 649 *N.W.*2d 94, 100 (finding that computerized check for information regarding outstanding arrest warrants is matter of public record), *appeal denied,* 467 *Mich.* 910, 655 *N.W.*2d 555 (2002). Because Sloane had no reasonable expectation of privacy in the public

---

2 The Court based its decision on New Jersey's Right to Know Law, *N.J.S.A.* 47:1A–1 to –4 (amended and repealed in part 2001), and clarifications later enacted in *N.J.S.A.* 39:2–3.3 and –3.4. Balancing the State's interests and the desire to protect motorists from unnecessary disclosure of personal information they had to supply to DMV, the Court directed that if the above information disclosed a basis for further police action, the officer could proceed to a second step and access " 'personal information' of the registered owner, including name, address, social security number, and if available, criminal record." *Donis, supra,* 157 *N.J.* at 55, 723 *A.*2d 35. The decision did not address why a person's criminal record—which is comprised of public record information— was considered "personal." As discussed *infra,* we find that no reasonable expectation of privacy attaches to criminal history information within the context of the Fourth Amendment or Article I, paragraph 7 of the State Constitution.

records maintained in NCIC—such as his two outstanding warrants and record of a parole violation—a check of the NCIC database was not a search, and police did not need reasonable and articulable suspicion of criminal activity to access that index.

## C.

Are there other constitutional concerns when police access the NCIC database during a traffic stop? That question turns on the reasonableness of the detention following a lawful traffic stop in two interconnected respects. First, was the detention "reasonably related in scope to the circumstances which justified the interference in the first place"? *See Dickey, supra,* 152 *N.J.* at 476, 706 *A.*2d 180 (quoting *Terry v. Ohio,* 392 *U.S.* 1, 20, 88 *S.Ct.* 1868, 1879, 20 *L.Ed.*2d 889, 905 (1968)). Second, did the NCIC check unreasonably prolong the length of the stop? *See United States v. Sharpe,* 470 *U.S.* 675, 685, 105 *S.Ct.* 1568, 1575, 84 *L.Ed.*2d 605, 615 (1985).

 There is no " 'litmus paper test' " for determining whether " 'a seizure exceeds the bounds of an investigative stop.' " *Dickey, supra,* 152 *N.J.* at 476, 706 *A.*2d 180 (quoting *Florida v. Royer,* 460 *U.S.* 491, 506, 103 *S.Ct.* 1319, 1329, 75 *L.Ed.*2d 229, 242 (1983) (plurality opinion)). "[C]ommon sense and ordinary human experience must govern over rigid criteria." *Id.* at 477, 706 *A.*2d 180. In addition, police conduct during a traffic stop must be evaluated "within the context of unfolding events." *Diloreto, supra,* 180 *N.J.* at 277, 850 *A.*2d 1226.

Many jurisdictions have found that running an NCIC check, in addition to a driver's license check, is within the scope of a traffic stop and is permissible so long as it does not unreasonably extend the time of the stop. *See McRae, supra,* 81 *F.*3d at 1535–36 n. 6 (explaining that during traffic stop, officer may access NCIC records to determine quickly existence of outstanding warrants); *State v. Lopez,* 873 *P.*2d 1127, 1133 (Utah 1994) (holding warrant check lawful if detention not extended beyond time necessary to request license and registration and issue citation); *see also*

*People v. McGaughran,* 25 *Cal.*3d 577, 159 *Cal.Rptr.* 191, 601 *P.*2d 207, 211 (1979) (explaining that warrant check lawful where it does not prolong traffic stop beyond time necessary to investigate original reason for detention); *People v. Smith,* 926 *P.*2d 186, 189 (Colo.Ct.App.1996) (finding that police may check for outstanding warrants, provided that duration of detention is not unreasonably extended); *State v. Smith,* 73 *Or.App.* 287, 698 *P.*2d 973, 976 (1985) (finding five-minute warrant check during stop lawful but warning that check may become unreasonable if inordinately long); *Petty v. State,* 696 *S.W.*2d 635, 638–39 (Tex.Ct.App.1985) (upholding stop where warrant check did not last more than a few minutes).

That rule has also been applied to NCIC checks of passengers when there was a basis for police to focus on the passenger. *See State v. Higgins,* 884 *P.*2d 1242, 1245 n. 2 (Utah 1994) (finding detention of passenger lawful when warrant check did not significantly extend time needed to conduct driver's license check); *State v. Mennegar,* 114 *Wash.*2d 304, 787 *P.*2d 1347, 1351–52 (1990) (finding check of passenger's driver's license, which revealed outstanding arrest warrant, valid where passenger was asked to drive car), *overruled on other grounds, State v. Hill,* 123 *Wash.*2d 641, 870 *P.*2d 313, 315 (1994).

■ In this case, there is no evidence in the record that the check of the NCIC database unreasonably prolonged the detention. It appears that the check was conducted simultaneously or nearly simultaneously with the check of Sloane's license. That is not unusual in light of advances in technology. What once required a call to a dispatcher and a physical search of documents can now be accomplished swiftly through computer transactions. Today, an NCIC query can produce a response in approximately .05 seconds. *40 Years of NCIC, supra.* As a result, when law enforcement officers elect to conduct an NCIC check, they can and should act with dispatch to avoid prolonging a stop for more than a brief period of time.

## D.

Accordingly, the police did not need reasonable suspicion to check Sloane's name in the NCIC database. Because accessing the NCIC database was within the scope of the traffic stop and did not unreasonably prolong it, we hold that the police acted within the boundaries of the federal and state constitutions throughout the traffic stop.

## V.

For the reasons set forth above, we affirm the Appellate Division's finding that a passenger is seized when police stop the car's driver. However, we reverse the judgment of the Appellate Division that defendant's motion to suppress should have been granted. As a result, we reinstate defendant's conviction and sentence.

*For affirmance/reversal/reinstatement*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE and RIVERA–SOTO—6.

*Opposed*—None.