**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5305-14T2
                    A-5603-14T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DEYVON T. CHISUM,

    Defendant-Appellant.

_____

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KESHOWN K. WOODARD, a/k/a
KESHOWN HOWARD,

    Defendant-Appellant.

_____

        Argued December 7, 2016

        Before Judges Accurso, Higbee and Manahan.

        Re-argued May 24, 2017 — Decided July 21, 2017

        Before Judges Accurso, Manahan and Lisa.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Indictment Nos. 14-07-1230 and 14-05-0921.

James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant Deyvon T. Chisum (Joseph E. Krakora, Public Defender, attorney; Mr. Smith of counsel and on the briefs).

Alison Perrone, Designated Counsel, argued the cause for appellant Keshown K. Woodard (Joseph E. Krakora, Public Defender, attorney; Alan I. Smith, Designated Counsel, and Ms. Perrone, on the briefs).

Monica do Outiero, Assistant Prosecutor, argued the cause for respondent (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Ms. do Outiero, of counsel and on the briefs).

PER CURIAM

After their suppression motion was denied, co-defendants, Deyvon T. Chisum and Keshown K. Woodard, each pled guilty to second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5b. Each defendant was sentenced, in accordance with his plea agreement, to five years' imprisonment with a forty-two month period of parole ineligibility. Defendants have filed separate appeals challenging the denial of their motion to suppress evidence. We consolidate the appeals for disposition in a single opinion.

Chisum presents the following argument on appeal:

POINT I

IN VIEW OF THE REPEATED VIOLATIONS OF
DEFENDANT'S FOURTH AMENDMENT RIGHTS, THE TRIAL
JUDGE CLEARLY ERRED IN DENYING THE MOTION TO
SUPPRESS.

A. The Detention Of Everyone Present In The
Motel Room Based Solely Upon A Noise
Complaint.

B. The Sweep Of The Bathroom And The Balcony.

C. The Continued Detention Of All Persons
Present For Warrant Checks Further Violated
Their Fourth Amendment Rights.

Woodard presents the following argument:

POINT I

SINCE THE POLICE DID NOT HAVE AN ARTICULABLE
SUSPICION TO SUPPORT AN INVESTIGATIVE
DETENTION OF THE DEFENDANT, AND SINCE THE PAT-
DOWN FRISK OF DEFENDANT FOR POLICE SAFETY WAS
A PRETEXT SEARCH, THE TRIAL COURT ERRED IN
DENYING DEFENDANT'S MOTION TO SUPPRESS.

We are unpersuaded by these arguments, and we affirm.

The search of these defendants occurred in connection with a
response by members of the Neptune Police Department to a noise
complaint at the Crystal Inn Motor Lodge. Officer Darell Harris
was the only witness at the suppression hearing. From the record
of that hearing, we derive the following facts.

On February 7, 2014, at about 11:50 p.m., Harris was on patrol
in the downtown area of Neptune. In the patrol car with him was
Officer Cris Sibole. They received a dispatch advising that a

noise complaint had been received from the Crystal Inn, and they responded to that location. Harris was familiar with the Crystal Inn, having responded to other calls there and from its known reputation within the police department. This facility was the site of significant criminal activity, including narcotics distribution offenses, homicides, robberies and burglaries. The noise complaint in this case came from the occupant of Room 223, who complained of loud noise coming from a nearby room, including loud music and voices.

When Harris and Sibole arrived, they entered the lobby and obtained from the receptionist a key to the residential portion of the building. While still on the first floor below the second floor location of Room 223, they could hear the music and voices. As they went up the stairs and got closer to that room, the noise increased. The occupant of Room 223 came out to the hallway and informed the officers that he or she was the person who had made the call about the loud party that was going on in the room next door, Room 221.

Because of the reputation of the hotel and the multiple voices the officers could hear from the hallway, they called for back-up. As they were standing outside of Room 221, the door opened. An individual later identified as James Delgado had opened it from inside and began to walk out. However, when he saw the police

4

there, he turned around and walked back in.  As he did so, he released the self-closing door, which began to swing closed. However, Sibole prevented the door from closing by placing his foot in the way.  He held the door partially open in that manner.[1]

Harris acknowledged at the hearing that Delgado was not free to leave.  The two officers remained in the hallway at the threshold of the entry door to Room 221.  From this location, they stated they were there in response to a noise complaint and inquired who was the renter of the room.  A woman sitting on the edge of the bed nearest the entry door, Zykia Reevey, responded that she was the renter and, without solicitation, she invited the officers in.  At about that time, three back-up officers arrived.

---

[1]  In his testimony, Harris said that Delgado was known to Sibole as a gang member.  The court sustained a defense objection on hearsay grounds.  The prosecutor did not pursue the point by arguing that, in some circumstances, hearsay is admissible at a suppression hearing.  Nor did the prosecutor take exception to the court's ruling.  Instead, the prosecutor moved on with his line of questioning about the sequence of events.  The State has not cross-appealed from the judge's evidence ruling.  On appeal, the State urges that we find that the judge erred in this evidence ruling and argues that we should consider, as a fact, that Delgado was a gang member, and that the police were aware of it.  We reject the State's position.  Had the prosecutor pursued the point, the judge might have reconsidered his ruling.  Cross-examination on the point might have elicited information regarding the reliability of the hearsay information.  The judge might or might not have reversed his ruling.  However, on the state of the record presented, we are bound by the ruling that was made.  Accordingly, we do not consider in any respect the State's proffer that Delgado was a known gang member.

A-5305-14T2

In response to Reevey's invitation, Harris, Sibole, and one of the back-up officers entered the room. The other two officers remained in the hallway.

Because of the number of people in the room and the high-crime nature of the facility, one of the officers walked into the bathroom and another stepped out onto the balcony. They were checking to see if anyone else was there. This measure was taken for police safety. No other people were present in either of those locations.

Harris said that when he stepped into the room he spoke to Reevey and asked everyone else there to produce their identification. Some were able to produce documentary identification. Others did not have documents, but provided identifying information, including name, address, date of birth, social security number, and the like. The officers relayed that information to their dispatchers to check all of the individuals for outstanding warrants.

When Harris first spoke to Reevey, she told him she was not aware the music was so loud that it was disturbing others, and she turned the volume down. Harris explained that "when we go to hotel rooms we want to speak to the person who's -- if they're a renter, they're basically -- in our eyes, we see them as the person in charge of that room." When asked why he and the other officers

A-5305-14T2

did not simply leave once the music was turned down, he said it was their procedure "to identify who's in a room or at least get the renter's name."

Harris elaborated that when responding to a noise complaint, officers can issue a summons or merely give a warning and direct that the noise be abated. In this case, they made the decision not to issue a summons but only to give a warning. However, he further explained that sometimes they are called back a second time, and it might be more likely that they would issue a summons after having first issued a warning that went unheeded. In those circumstances, it is necessary to have recorded the identity of all of the people who were present at the time of the initial complaint. Harris also said that, having obtained the names of all who were present and participating in the party, it is also standard procedure to obtain warrant checks, which they do on any call for service.

Therefore, even after having made the decision not to issue a summons and having given a warning, the police continued to detain all of the participants while warrant checks were being made. This process took about twenty minutes. During the course of the process, it was learned that at least one individual had given a false name. When her real name was finally ascertained, it turned out she did have an active warrant, and she was placed

A-5305-14T2

under arrest and detained in the hallway.  As warrant checks were coming back negative, those individuals were permitted to leave, and in fact did leave the hotel room.[2]

The warrant check for Chisum came back positive.  He was placed under arrest.  A search incident to arrest revealed that he had a handgun tucked in his waistband.  The gun was seized. Chisum was restrained in the hallway along with the woman we mentioned earlier.  At this point, the officers directed all remaining occupants of the room, including Woodard, to place their hands on their heads and advised them they were going to be patted down for weapons.  The officers deemed this necessary to provide for their safety.  The pat down of Woodard revealed that he too possessed a handgun, which was also seized.

The record checks were run through the County dispatch system. The computer-aided dispatch (CAD) report indicated that the first name provided to dispatch for a warrant check was Woodard's, at 12:12 a.m.[3]  Referring to those same records, Harris initially testified that Woodard's warrant check was the first to come back

---

[2]  Indeed, Delgado was one of the individuals released in that process.

[3]  The CAD report specifies the times to the second.  We are rounding off the times to the nearest minute in this opinion.

negative at 12:23 a.m. The records further reflected that the positive warrant check for Chisum was received at 12:32 a.m.

This sequence of events would establish that Woodard would have been released and free to leave the room before Chisum was arrested and searched. Harris then explained that the CAD records are not always accurate, because the data is inputted by the dispatchers as soon as they have time to make the entries, not contemporaneously with when the information is received. Harris was thoroughly familiar with the procedures, because he had been a county dispatcher for seven years before becoming a police officer. Therefore, he suggested that Woodard might not have been the first name called in and might not have been given a negative report at the times indicated on the CAD records. The State contends that, because the other individuals who received negative checks were free to leave and did leave, it is reasonable to infer that Woodard's check had not yet come back when Chisum was searched because Woodard was still there at the time.

In a written decision, the trial court determined that the police entry into the room was by invitation, and thus by consent, as a result of which the officers lawfully entered the room. The court further found that warrant checks do not constitute searches, as there is no expectation of privacy in public records. The court found that Chisum was properly arrested based on an

outstanding warrant, and that the seizure of the gun he possessed was obtained as a result of a lawful search incident to arrest. Finally, the court found that the police were justified under the totality of the circumstances in conducting pat down searches of the remaining occupants for police safety. Accordingly, the gun found in Woodard's possession was discovered during a lawful pat down search for weapons.[4]

Defendants argue that the police committed two constitutional violations at the beginning of this encounter with the occupants of Room 221. The first was Sibole's placement of his foot to block the door from closing. The second was the protective sweep the officers performed of the bathroom and balcony without any basis to believe that one or more individuals would be found in those locations and that they would pose a threat to police safety.

The State concedes that Sibole's use of his foot to prevent the door from closing without a warrant or the existence of an exception to the warrant requirement constituted a violation of the Fourth Amendment rights of the room's occupants. See State

---

[4]  The judge did not make a specific finding that Woodard was still being detained because his warrant check had not yet come through at the time the gun was found on Chisum. However, we infer that, because the judge found that the pat down search of Woodard was lawful, he accepted Harris' explanation that if Woodard's check had come back as negative by that time, he would have left the premises like the other participants whose checks came back as negative had already done.

v. Jefferson, 413 N.J. Super. 344, 355-56 (App. Div. 2010). However, the State argues that because that conduct was attenuated by the intervening event of Reevey's invitation to the officers to enter the room, the misconduct is of no consequence. Defendants do not dispute this, and we agree. This conduct did not provide a basis for suppression of evidence.

The State defends the conduct of the officers regarding the sweep of the bathroom and balcony. The State contends that under the totality of the circumstances, the officers had a reasonable and articulable suspicion justifying concern for their safety. They were outnumbered by the occupants in the room, and the hotel had a known history for violent criminal activity. The search was cursory and brief. Defendants argue that the sweep was not justified because there was no genuine concern for police safety and there was no basis upon which to believe that anyone was in the areas swept. See State v. Davilla, 203 N.J. 97, 128 (2010).

We need not decide the issue because, as with the foot-in-the-door issue, the sweep did not result in or lead to the seizure of the evidence sought to be suppressed. There was no causal link connecting the sweep of those two areas and the subsequent searches of Chisum and Woodard. The searches of defendants were occasioned by intervening events derived from the warrant checks, which would have been conducted whether or not the sweeps had occurred.

11

Indeed, defendants' argument on this issue is limited to using it as evidence that no one was free to leave, which the State does not dispute.

This brings us to the crux of the matter. Stated simply, defendants argue that because the police encounter was in response to a noise complaint, which could constitute a violation of a municipal ordinance, the occupants were improperly detained beyond the point when a warning was issued to Reevey. According to defendants, the volume of the music was turned down, the warning was given, and the investigation was completed. Defendants seize upon Harris' affirmative response to the following cross-examination question: "So your investigation was complete when she agreed to turn the noise down and you decided not to give her a summons for the ordinance violation, correct?" Harris answered: "Yes." However, this answer must be viewed in the context of all of Harris' testimony on this point, including his explanation that the identity of all participants involved in a noise complaint must be ascertained in case there is a callback.

Initially, we disagree with defendants that because the investigation involved only the potential municipal ordinance violation, and not a crime, some lower level of police intrusiveness should apply. This is not the case. The police are entitled to investigate potential ordinance violations in the same

manner as they conduct other investigations, and following the same standards. See e.q., State v. Kaltner, 420 N.J. Super. 524, 529-31 (App. Div. 2011), aff'd o.b., 210 N.J. 114 (2012); State v. Nishina, 175 N.J. 502, 512 (2003); State v. Hurtado, 219 N.J. Super. 12, 23 (App. Div. 1987) (Skillman, J.A.D., dissenting), rev'd on dissent, 113 N.J. 1 (1988). Indeed, the investigative standards remain the same when a motor vehicle is stopped for a potential low level motor vehicle violation. See State v. Sloane, 193 N.J. 423, 425-26 (2008).

From the outset of this police encounter, beginning with Delgado's effort to leave the hotel room which the police prevented, this was an investigative detention. Harris acknowledged in his testimony that Delgado was not free to leave, and it is beyond dispute that "'an objectively reasonable person' would feel 'that his or her right to move ha[d] been restricted.'" State v. Rosario, ____ N.J. ____, _____ (2017) (slip op. at 10) (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). That circumstance continued with respect to both defendants until the time of their arrest.

In analyzing the propriety of an investigative detention, it must first be determined whether the encounter was "justified at its inception" and "by a reasonable and articulable suspicion of criminal activity." Id. at ____ (slip op. at 16) (quoting State

13                                                          A-5305-14T2

v. Dickey, 152 N.J. 468, 476 (1998)). The initial encounter here was clearly justified. The police responded to a call from a citizen complaining of a possible ordinance violation. Upon arrival, that citizen confirmed with the officers the basis for the call. As the officers stood outside of Room 221, they heard the loud noise themselves. They possessed not only a reasonable suspicion, but probable cause, that a violation was occurring.

The next issue, which is the critical issue in this case, is whether the detention of defendants was unreasonably prolonged. In addition to reasonableness of the detention at its inception, "the scope of the continued detention must be reasonably related to the justification for the initial interference." State v. Coles, 218 N.J. 322, 344 (2014) (emphasis added). Further, the police must use the least intrusive means necessary to effectuate the purpose of the investigative detention, State v. Davis, 104 N.J. 490, 504 (1986), and the detention must "last no longer than is necessary to effectuate the purpose of the stop." State v. Shaw, 213 N.J. 398, 411 (2012) (quoting Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325, 75 L. Ed. 2d 229, 238 (1983)).

Our Supreme Court has recognized that police may perform National Crime Information Center (NCIC) checks on the driver and passengers of an automobile during a valid traffic stop "so long as it does not unreasonably extend the time of the stop." Sloane,

supra, 193 N.J. at 436-38.  The Court concluded that an NCIC check

is not a search under the federal or state constitutions.  Id. at

436.   This check includes information regarding outstanding

warrants.   Id. at 436-37.   The rule allowing these checks in

connection with motor vehicle stops applies to passengers "when

there was a basis for police to focus on the passenger."  Id. at

438.

These principles are applicable in the circumstances of this

case.  First, the occupants of the room were all participants in

the noisemaking.  The officers heard multiple loud voices as they

stood outside of the door.  The occupants were all listening to

the loud music and, whether directly responsible for setting the

volume at a high level or acquiescing in that level of noise, all

ten of the occupants, not just Reevey, could have been charged

with violating the noise ordinance.  See Kaltner, supra, 420 N.J.

Super. at 545.  Harris' testimony that the police consider the

renter of a room "in charge of that room" does not mean that the

renter is the only possible violator.  Neptune Township Municipal

Ordinances 3-1.1 and 3-1.2 allow the Township to issues summonses

to any person who makes unreasonably loud noises at such volume to disturb others in a hotel.[5]

Further, although the police exercised their discretion in issuing only a warning, the police articulated a legitimate basis for ascertaining the identity of all present, namely in case there was a callback for a continuing noise violation. Accordingly, there was a basis for the police to focus on all occupants of the room and to obtain their identities. It follows that, because a warrant check does not constitute a search, the warrant checks were permissible.

The remaining question is whether the time required for the checks unreasonably prolonged defendants' detention. Generally, an investigative detention should last no longer than the time required to complete the investigation, measured under a totality

---

[5] The ordinances prohibit "any unnecessary, unreasonably loud, disturbing noise which either annoys, injures or endangers the comfort, repose, health or welfare of others," including the playing of music through various devices "at such volume as to annoy or disturb the quiet, comfort or repose of any persons in any dwelling, hotel or any other type of residence."

They provide that "[a]ny person, firm, or corporation violating any of the provisions of this section shall upon conviction be liable to the penalty stated [elsewhere in this Code]." General Ordinances of the Twp. of Neptune Ch. 3-1, Unnecessary and Disturbing Noise, available at, http://clerkshq.com/default.ashx?clientsite=neptunetwp-nj (last visited May 12, 2017).

of the circumstances test.  State v. Bernokeits, 423 N.J. Super. 365, 372 (App. Div. 2011).  There is "no rigid time limitation on Terry[6] stops.  United States v. Sharpe, 470 U.S. 675, 685, 105 S. Ct. 1568, 1575, 84 L. Ed. 2d 605, 615 (1985).  A detention may become too long if it involves a "delay unnecessary to the legitimate investigation of the law enforcement officers."  Id. at 687, 105 S. Ct. at 1576, 84 L. Ed. 2d at 616.

In Dickey, supra, 152 N.J. at 481, our Supreme Court discussed "the outer limits of duration of a detention."  Referring to Sharpe, supra, 470 U.S. at 686-88, 105 S. Ct. at 1575-77, 84 L. Ed. 2d at 615-17, the Court noted "that a twenty-minute detention was reasonable when the police acted diligently and defendant contributed to the delay."  Dickey, supra, 152 N.J. at 481; see also State v. Colapinto, 309 N.J. Super. 132, 138 (App. Div. 1998) (finding twenty-five minute detention reasonable under the circumstances).  The Dickey Court also cited other cases in which the police detention of individuals for periods of up to seventy-five minutes had been upheld:

> Using the foregoing [Terry/Sharpe] test, courts have upheld detention of forty-five minutes, United States v. Davies, 768 F.2d 893, 901 (7th Cir.), cert. denied, 474 U.S. 1008, 106 S. Ct. 533, 88 L. Ed. 2d 464 (1985); fifty minutes, United States v. Alpert, 816

---

[6]  Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

F.2d 958, 964 (4th Cir. 1987); sixty minutes, <u>United States v. Large</u>, 729 F.2d 636, 639 (8th Cir. 1984); <u>United States v. Campbell</u>, 627 F. Supp. 320, 325-26 (D. Alaska 1985), <u>aff'd</u>[,] 810 F.2d 206 (9th Cir. 1987); and seventy-five minutes, <u>United States v. Borys</u>, 766 F.2d 304, 313 (7th Cir. 1985), <u>cert. denied</u>, 474 U.S. 1082, 106 S. Ct. 852, 88 L. Ed. 2d 893 (1986). Each of the last four cited cases involved delays necessitated by efforts to obtain a narcotics dog for sniffing luggage or packages, as in this case.

[<u>Ibid.</u> (quoting <u>Limonja v. Commonwealth</u>, 8 Va. App. 532, <u>cert. denied</u>, 495 U.S. 905, 110 S. Ct. 1925, 109 L. Ed. 2d 288 (1990)).]

On the other hand, the Court cited instances in which detentions of three hours, more than two hours, and ninety minutes, had not been upheld. <u>Id.</u> at 481-82.

In the case before us, the delay was about twenty minutes beyond the point at which the decision was made to issue a warning and not a summons, but to continue the investigation by ascertaining the identity of all of the participants. There is nothing in the record to suggest that any of the participants did anything to cause or contribute to this delay.[7] And, of course, no narcotic-sniffing dogs were involved. Ultimately, "[i]n any given case, the reasonableness of the investigatory detention is a function of the degree and kind of intrusion upon the

_____

[7] One of the participants did provide a false name, which may have caused some delay.

individual's privacy balanced against the need to promote governmental interest." Bernokeits, supra, 423 N.J. Super. at 372 (citing State v. Davis, 104 N.J. 490, 504 (1986)).

In our totality of the circumstances analysis, we note that the correct identities of ten individuals had to be ascertained. Some of them, including Chisum, did not have identification documents on their person. One provided false information which then had to be further investigated. The police promptly called county dispatch to request warrant checks. As negative warrant checks were provided, those individuals were immediately released and allowed to leave.

We agree with the State that ascertaining the identity of all participants was a legitimate part of the investigation, and therefore part of the mission of the police during this encounter. Until the identity of each individual could be verified and a warrant check obtained, the mission was not complete. Ten participants were involved and the police acted expeditiously in completing the process within about twenty minutes. During that time, some of the participants had already been released based on their negative warrant checks. Under the totality of the circumstances, we are satisfied that the additional detention of defendants for about twenty minutes, who were detained in the hotel room where they had been participating in a party, and

unrestrained, constituted a very minimal additional intrusion upon their privacy. Balancing this against the need of the police to complete their mission, we conclude that the detention was not unreasonably prolonged.

Chisum does not dispute that the search of his person incident to his arrest on an outstanding warrant was, of itself, lawful. His suppression argument is based upon his assertion of an unreasonable delay in his detention.

Woodard has an argument in addition to the contention that the detention was unreasonably prolonged. He argues that the Terry pat down search of his person following the arrest of Chisum was done without reasonable and articulable suspicion that he posed a threat to the police officers' safety. We do not agree.

To conduct a pat down search, an "officer must have a 'specific and particularized basis for an objectively reasonable suspicion that defendant was armed and dangerous.'" State v. Roach, 172 N.J. 19, 27 (2002) (quoting State v. Thomas, 110 N.J. 673, 683 (1988). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." State v. Valentine, 134 N.J. 536, 543 (1994) (quoting Terry, supra, 392 U.S. at 27, 88 S. Ct. at 1883, 20 L. Ed. 2d at 909). "[T]he same conduct that

justifies an investigatory stop may also present the officer with a specific and particularized reason to believe that the suspect is armed." State v. Privott, 203 N.J. 16, 30 (2010). Reasonable suspicion to frisk "is based on the totality of the circumstances." Roach, supra, 172 N.J. at 27.

In assessing the totality of the circumstances, courts consider a number of factors, including an officer's experience and knowledge, Pineiro, supra, 181 N.J. at 22; the area's high-crime status, Valentine, supra, 134 N.J. at 543, 547, 553-54; a suspect's nervousness and furtive gestures, in conjunction with other objective facts, see State v. Elders, 192 N.J. 224, 250 (2007); and the number of occupants as compared to the number of officers at the scene, State v. Lipski, 238 N.J. Super. 100, 105 (App. Div. 1990).

In our view, the totality of the circumstances provided the police with an objectively reasonable suspicion that their safety was in danger. The hotel was known for a high frequency of violent crimes. A gun had just been found on the person of Chisum, one of the occupants of the room. A number of unrestrained additional participants, including Woodard, were still present in the room. One participant had provided the police with false information regarding her identity.

On the other side of the ledger, we recognize that there were a total of seven officers on the scene at this time, and fewer than ten remaining participants. We are also mindful that Woodard had been cooperative throughout the entire episode and did not exhibit any furtive movements or other indicia of aggressive behavior. Of course, that could have all changed with respect to any of the remaining participants once they knew a gun had been found on Chisum and he was arrested.

All things considered, and recognizing the significant deference that should be afforded to police to protect themselves in potentially dangerous situations, we conclude that the pat down searches of the remaining participants for weapons was justified. Woodard does not contest that the pat down search was conducted in a legally correct manner.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5305-14T2