SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

## State of New Jersey v. Byseem T. Coles (A-15-12) (070653)

**Argued October 22, 2013 – Decided May 19, 2014**

**LaVECCHIA, J., writing for a majority of the Court.**

In this appeal, the Court considers the validity of a warrantless search, which was consented to by the homeowner and which occurred while the defendant was unlawfully detained.

Late on May 18, 2009, Camden City Police Department Sergeant Zsakhiem James responded to a report of a robbery. James quickly arrived at the location and saw defendant Byseem T. Coles, who matched the description of the robber, walking in his direction on the street where the crime occurred. James exited his vehicle and questioned defendant, who appeared nervous, detaining him after he gave suspicious answers. Although a patdown revealed no weapons or evidence of the robbery, defendant was placed in the back seat of a patrol car. Defendant claimed he lived on the street where he was walking, but he was unable to present identification proving his claim. Instead, he told James that there were relatives at his home who could identify him. At that point, the robbery victim arrived for a showup identification. Although defendant's clothes matched those of the robber, the victim was unable to identify him as the perpetrator. James and another detective then left defendant in the patrol car while they walked to the nearby home at which defendant claimed to reside.

Thelma Coles, the homeowner and defendant's aunt, confirmed that defendant lived in the house. James wanted to view defendant's room since he believed defendant had stopped home after the robbery. After repeatedly asking Ms. Coles for permission to enter the room, she agreed. The door to defendant's room was ajar a few inches and a locked padlock was hanging from it. Other doors on the floor also were fitted with padlocks, and Ms. Coles explained that the locks were primarily intended to keep younger children from rummaging through other people's belongings. In his search of the room, James discovered a shotgun and three rifles.

Defendant was indicted on multiple weapons charges, including second-degree certain persons not to possess weapons. He moved to suppress the evidence found in his bedroom. The trial court denied the motion, finding that defendant was lawfully detained because police had reasonable suspicion to stop him and pat him down. The court also concluded that James reasonably believed that Ms. Coles had authority to consent to the search of defendant's bedroom and that her consent was voluntarily given since she signed the consent form and admitted that she saw no reason why she should not do so. Defendant pleaded guilty to second-degree certain persons not to possess weapons and was sentenced to a five-year prison term with five years of parole ineligibility.

The Appellate Division reversed the denial of defendant's motion to suppress and his conviction. The panel focused on whether the third-party consent search was legitimate, determining that Ms. Coles's consent was invalid since her familial and informal landlord status did not suffice to give her common authority over defendant's bedroom. Thus, the failure of the police to seek defendant's consent, particularly in light of his nearby retention under what the panel viewed as questionable circumstances, rendered the search unlawful. The panel noted that reasonable suspicion to continue defendant's detention likely ceased to exist when the victim could not identify him. The Court granted the State's petition for certification. 212 N.J. 432 (2012).

**HELD:** Under the circumstances presented here, a third party's consent to conduct a warrantless search of a defendant's living space is insufficient to justify the search when the defendant is unlawfully detained by police.

1. The New Jersey and Federal Constitutions guarantee freedom from unreasonable searches and seizures, viewing the warrantless entry into a person's home as presumptively unreasonable. In order to sustain the validity of a

warrantless search, the State must demonstrate that it fits within an accepted exception to the warrant requirement, such as the consent-to-search exception. In consent-based searches, the State bears the burden of proving that proper consent was freely and voluntarily given. In a series of cases dating back forty years, the United States Supreme Court has addressed the right of police officers to conduct warrantless searches of homes based on consent given by a third party. In Georgia v. Randolph, 547 U.S. 103, 122-23 (2006), the Supreme Court considered the validity of an occupant's consent in the face of an objecting co-occupant, holding that it is objectively unreasonable for police to rely on a consenting occupant when faced with a present and objecting co-occupant. However, the search may be deemed objectively reasonable where a potentially objecting co-occupant is not present for the threshold colloquy, so long as there is no evidence that the co-occupant was deliberately removed by police to avoid the objection. Id. at 121. In the Supreme Court's most recent opinion on this issue, Fernandez v. California, 571 U.S. ___, ___ (2014), it reaffirmed that the objective-reasonableness test prevails and clarified that a potentially objecting occupant whose absence is due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason. (pp. 16-21)

2. Like federal law, New Jersey law recognizes a third party's ability to consent to a search when the consenter has common authority for most purposes over the searched space. Although a police officer need not be ultimately correct about a party's ability to consent, the officer's belief must have been objectively reasonable in light of the facts and circumstances known at the time of the search. (pp. 21-23)

3. Here, turning first to the seizure of defendant's person, the Court notes that it is undisputed that a police officer may conduct an investigatory stop where the officer has a particularized suspicion based on an objective observation that the person has engaged, or is about to engage, in criminal wrongdoing. The stop must be reasonable and justified by articulable facts. The duration of a properly-conducted stop may be extended for a reasonable, limited period for investigative purposes. In order for a continued detention to be deemed reasonable, it must have been reasonable at its inception and throughout its entire execution. When the duration of the detention is at issue, courts must determine whether the police diligently pursued a means of investigation that was likely to quickly confirm or dispel their suspicions, during which time the defendant's detention was necessary. (pp. 23-28)

4. The Court agrees with the trial court and the Appellate Division that the initial stop and detention of defendant was reasonable. However, once defendant was not identified as the perpetrator during the showup, his continued detention was unreasonable. Once a detention becomes unreasonable, a de facto arrest occurs, requiring that the police have probable cause that the defendant has committed or is committing an offense. Here, defendant's detention continued even though the showup failed to develop probable cause for his arrest. However, in light of James's suspicion and defendant's lack of identifying documents, the Court allows that James had the flexibility to detain defendant while seeking confirmation of his identity from his relatives. Once the officers confirmed defendant's identity, they no longer had sufficient legal reason to continue his detention. (pp. 28-31)

5. Applying Fernandez, Ms. Coles's consent was invalid since it was manufactured through defendant's unlawful detention. Thus, based on the protection afforded by Article I, Paragraph 7 of the New Jersey Constitution against unreasonable searches of one's home and living space and under the totality of these circumstances, the warrantless search of defendant's bedroom was not objectively reasonable. This holding is bolstered by Fourth Amendment principles and the Supreme Court's holding in Fernandez. In light of this conclusion, there is no need to address whether Ms. Coles's authority was sufficient to grant access to defendant's room. (pp. 31-34)

The judgment of the Appellate Division is **AFFIRMED AS MODIFIED**.

**JUSTICE PATTERSON, DISSENTING,** expresses the view that state and federal search and seizure jurisprudence requires reversal of the Appellate Division's determination and that, contrary to the majority's assertion, its holding is unsupported by federal search and seizure jurisprudence because this case falls outside of the narrow category of situations defined by the Supreme Court in Randolph and Fernandez, in particular since the potentially objecting occupant was not present at the home when the police arrived, or at any time during the search.

**CHIEF JUSTICE RABNER, JUSTICE ALBIN, and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE LaVECCHIA's opinion. JUSTICE PATTERSON filed a separate dissenting opinion.**

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

        v.

BYSEEM T. COLES,

    Defendant-Respondent.

Argued October 22, 2013 – Decided May 19, 2014

On certification to the Superior Court,
Appellate Division.

Frank Muroski, Deputy Attorney General,
argued the cause for appellant (John J.
Hoffman, Acting Attorney General of New
Jersey, attorney; Hillary K. Horton, Deputy
Attorney General, of counsel and on the
briefs).

Daniel V. Gautieri, Assistant Deputy Public
Defender, argued the cause for respondent
(Joseph E. Krakora, Public Defender,
attorney).

Alexander R. Shalom argued the cause for
amicus curiae American Civil Liberties Union
of New Jersey Foundation (Edward L. Barocas,
Legal Director and Ronald K. Chen, Acting
Dean of Rutgers Constitutional Litigation
Clinic Center for Law & Justice attorneys;
Mr. Shalom, Mr. Barocas, Mr. Chen, and
Jeanne M. Locicero, of counsel and on the
brief).

JUSTICE LaVECCHIA delivered the opinion of the Court.

1

This appeal involves the validity of the warrantless search of the bedroom of defendant, Byseem Coles, a young adult, nine days shy of twenty years old when the events pertinent to this appeal occurred. Defendant lived with other family members in his aunt's home in Camden where he had his own bedroom. The bedroom door had a padlock on it to keep others, especially young children living in the household, from getting into his private belongings.

On the evening of March 18, 2008, when defendant was walking in the neighborhood in which he lived, he was detained by a police officer investigating a reported robbery in the area. After a showup in which the robbery victim failed to identify defendant as the perpetrator, and after a search of defendant's person that produced no evidence linking defendant to the crime, defendant's detention was continued because he had no identifying documents on his person. At defendant's urging, two officers walked a few houses over from where defendant was being held in a patrol car to ask one of defendant's relatives to confirm that he lived at the address he had given the police. Instead of merely confirming defendant's identity and that he lived in the home, the inquiries by the police turned into a concerted effort to obtain defendant's aunt's permission to search defendant's bedroom. During the ensuing search, weapons

2

unrelated to the robbery under investigation were found in his room.

We conclude that defendant's detention was unlawful. The police lacked probable cause to continue his detention after the showup and the search of defendant produced no evidence linking him to the crime. Although the police officers were entitled to a reasonable, but brief, opportunity to confirm defendant's identity, that identification was accomplished at the threshold of defendant's home. When the police efforts turned immediately thereafter to securing from defendant's aunt consent to search defendant's bedroom, their actions were premised on the belief that the man held in the patrol car was Byseem Coles. However, at that point, defendant's detention ceased to be lawful. The interactions with defendant's aunt cannot be disentangled from the unlawful detention of defendant in a patrol car parked a few houses down the street. Thus, the objective reasonableness of this asserted consent-based search founders on the unlawfulness of the police detention of defendant in the totality of these circumstances.

Accordingly, under the totality of these circumstances, we hold that the warrantless search of defendant's bedroom was not objectively reasonable, and we base that holding on the protection provided by Article I, Paragraph 7 of the New Jersey Constitution against unreasonable searches of one's home and

3

personal living space. See State v. Evers, 175 N.J. 355, 384 (2003) (granting privacy interests in home "the highest degree of respect and protection in the framework of our constitutional system").

Although our decision is based on state constitutional law, our holding is bolstered by Fourth Amendment principles. Federal case law supports the conclusion that a warrantless consent-based search is objectively unreasonable and unconstitutional when premised on defendant's illegal detention. See Fernandez v. California, 571 U.S. ___, ___, 134 S. Ct. 1126, 1134, 188 L. Ed. 2d 25, 35 (2014).

I.

A.

The facts as summarized are based on the testimony from the hearing conducted by the suppression court. Differences between what the officer learned at the scene and the information elicited at the suppression hearing are highlighted.

At 11:34 p.m. on May 18, 2009, Sergeant Zsakhiem James of the Camden City Police Department responded to a report of a robbery in Camden. The dispatcher informed James that a "male had just robbed a female in the area of the 1100 block of Lakeshore Drive" and described the perpetrator as a "black male wearing black pants and a gray hooded sweatshirt." James

4

testified that there was "information that [the perpetrator] used a weapon," which James believed to be a handgun.

According to James, he arrived at the location within "minutes" and began driving from the 1100 block, where the crime took place, toward the 1300 block. James saw defendant, who matched the description of the robber, walking in James's direction on the street where the crime took place; in other words, defendant was walking toward his home, which was situated between defendant and the officer's approaching vehicle. James exited his vehicle, approached defendant, and engaged him in conversation. James testified that he detained defendant because he gave suspicious answers to questioning about where he was coming from[1] and because defendant appeared "nervous" and "fidgety." James conducted a Terry[2] frisk and called for a backup unit because a police dog occupied the back of his K-9 vehicle and he had no other place in which to secure defendant. The patdown of defendant revealed no weapons or any evidence of the robbery. Nevertheless, defendant was placed in the back seat of the backup unit that had arrived.

James then asked defendant where he lived. Defendant replied that he lived at 1287 Lakeshore Drive, the block on

---

[1] Defendant told James that he was coming from a takeout restaurant several blocks away where, he said, he had purchased a soda.

[2] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

5

which he had been walking; however, he was unable to produce identification to prove it.  He told the officers that there were relatives at home with whom he lived -- an aunt and a cousin -- who could identify him.

At that point, the victim of the robbery arrived for a showup identification and defendant was removed from the police vehicle.  The victim was unable to identify defendant as the perpetrator after viewing his face because, she said, "the robber had a mask on."  Based on defendant's outfit -- the ubiquitous black pants and grey hooded sweatshirt of many young urban males -- the victim added that defendant's clothes matched the clothes the robber had worn.

The officers returned defendant to the back seat of the patrol car.  James, along with a detective, walked six houses down the street to the residence at which defendant claimed to reside.  A woman who identified herself as Thelma Coles, the homeowner, answered their knock on the door.  James explained that the officers were investigating a robbery.  He told Ms. Coles that they "had a young man in . . . custody who[] identified himself as Byseem Coles and stated that he lived there."  They asked her "if she had any identification for him."  She replied that the officers could not have her nephew because she had "just heard him inside . . . his room moving and banging around."  However, after having another family member check the

6

bedroom while the officers waited at the threshold, she learned that he was not home.

B.

According to James, he then wanted to view defendant's room himself because he believed that defendant had stopped home after committing the robbery and that evidence of the crime might be discovered in the bedroom. He repeatedly asked Ms. Coles for permission to view the room. Although other family members urged her not to agree, Ms. Coles ultimately agreed to let in only James.

She directed him to the bedroom at the top of the stairs leading from the front door. Once there, James observed a locked padlock hanging from the door, although the door was ajar a few inches. Other doors on the floor were also fitted with padlocks. He asked Ms. Coles if she had a key to the padlock on defendant's bedroom door and learned that she did. He also learned that a padlock was on defendant's bedroom door, as well as others, to keep others, especially younger children in the house, from touching or rummaging through other people's belongings that were kept in their bedrooms. James's questioning of Ms. Coles persisted at the bedroom doorway and he extracted from Ms. Coles that she had slept in defendant's

7

bedroom recently. No other questions were asked of Ms. Coles at the time.[3]

Concluding that she had authority to consent to a search of the room, James began a methodic search that included looking in first one, and then a second, duffle bag sitting on the floor of the bedroom's closet in order, as he explained it, to look for the victim's purse or a handgun hidden under the bags in the closet. After picking up the first zippered-closed bag, James opened it because he thought he felt the stock of a shotgun in it. Discovering a shotgun in the first bag, he opened the second duffle bag that had been underneath and that had fallen to the ground with a loud thud. He found a rifle in that bag. The remainder of the search involved looking under a floor vent, opening a safe in the room, and going through closed drawers. Two more rifles were found below the floor vent. Ammunition for unrelated weapons was found in the safe and in a bag in a

---

[3] Later, at the suppression hearing, Ms. Coles elaborated on her statement. She testified that she had slept in defendant's bedroom a couple of months earlier when her father, for personal reasons, had stayed in her home for several weeks. On that occasion, defendant had stayed with his mother for those weeks to make room for the extra family member. Ms. Coles emphasized that, although she used the bedroom for sleeping purposes, she did not disturb defendant's belongings other than to watch the television located in his room. That detail concerning Ms. Coles's use of the room, and other information regarding arrangements about defendant's payment of rent, was not known to James at the time of the search. Once James learned that Ms. Coles had slept in the room, he did not ask any other questions to probe the nature of her authority over the room.

dresser drawer.  The ammunition found in the safe is not part of the suppression motion before us.

C.

On August 13, 2009, a Camden County grand jury indicted defendant on three counts of third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(c)(1); third-degree unlawful possession of a sawed-off shotgun, N.J.S.A. 2C:39-3(b); fourth-degree unlawful possession of a defaced firearm, N.J.S.A. 2C:39-9(e); fourth-degree unlawful possession of a large capacity ammunition magazine, N.J.S.A. 2C:39-3(j); and second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b).  Defendant filed a motion to suppress the evidence found in his bedroom.  After hearing testimony and argument, the motion court denied the application in a written opinion.

The motion court first dispensed with the legitimacy of defendant's detention, finding that the police had reasonable suspicion to conduct a Terry stop and patdown search when defendant matched the sex and race description, and wore clothing fitting the description reported by the victim; gave "incongruous answers"; and was "fidgety" and "nervous" when describing his whereabouts.  The court concluded that defendant's detention was valid.

Next, the court concluded that Ms. Coles had authority to consent to a search of defendant's bedroom.  The court found

9

that she and defendant "share[d] control of the space" because she occasionally slept in the room. Although there was a padlock on the door, Ms. Coles had a key to that lock and to those on the other doors, which had been installed prior to the time defendant moved into the home to keep younger children from accessing other persons' rooms. Those facts, along with the informal nature of the rental arrangement between defendant and Ms. Coles, which was brought out in the hearing but not during the exchange between James and Ms. Coles at the time of the search, persuaded the court that defendant had no reasonable expectation of privacy in the room. With respect to whether Sergeant James could have reasonably believed that Ms. Coles had apparent authority over the bedroom, the court found that James held a reasonable belief that she could consent to the search because James had no way to know at the time of the search if defendant paid rent; Ms. Coles had told him that she had accessed defendant's room in the recent past to sleep there; Ms. Coles consented in writing to the search; and she showed James to the bedroom door, which was ajar.

Turning to the voluntariness of Ms. Coles's consent, the court considered the impact of Sergeant James's statement, testified to by Ms. Coles and not disputed by James, that he did not have a search warrant but "could get one." Noting that it was arguably a coercive statement, the court determined that

consent was voluntarily given, relying on its findings that James told Ms. Coles that she could refuse consent, that she signed a consent form, and that she acknowledged at the suppression hearing that she saw no reason why she should not consent to the search.

Finally, the court dispensed with arguments that the search exceeded the permissible scope authorized by Ms. Coles. Those arguments are not pertinent to our analysis and therefore will not be examined in detail.[4]

Defendant pleaded guilty to the charge of second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b), in exchange for dismissal of the remaining charges. The court sentenced defendant to a five-year prison term with five years of parole ineligibility. Defendant also was sentenced to a three-year prison term for a violation of probation charge, which was made to run concurrent with the sentence on the certain-persons offense.

D.

---

[4] The court found that, although third-party consent does not authorize a search inside another person's private belongings unless those items are in plain view, James immediately recognized the feel of a shotgun inside the duffle bag in the closet when he was searching for the stated objects of his search, namely evidence of the robbery. After the initial finding of the shotgun, the court explained that James saw a rifle and magazine clip in the second unzipped bag that fell to the floor when he had moved the first bag. The court found that the community-caretaking exception to the warrant requirement justified a search of the remainder of defendant's bedroom.

11

In an unpublished decision dated April 11, 2012, the Appellate Division reversed the denial of defendant's motion to suppress. The panel analyzed the motion with a focus on whether the third-party consent search was legitimate and determined that defendant's "aunt did not have common authority over his bedroom, and therefore could not consent to the search." The panel also concluded that "the failure of the police to ask defendant for his consent -- especially when defendant was nearby and was being held in police custody under circumstances that were, at best, questionable -- rendered the ensuing search unlawful." The panel explained that courts assess the "reasonableness of the search in the totality of the circumstances, and must avoid applying" exceptions to the warrant requirement "in a vacuum."

According to the panel, Ms. Coles did not have common actual authority to consent to the search because, even if Ms. Coles accessed defendant's room for "'limited purposes,' that . . . does not give [her] authority to consent to a search." The panel stated that although Ms. Coles occasionally slept in defendant's bedroom and had a key to it, her familial and landlord status did not give her authority to consent to a search of defendant's bedroom. The panel determined that the motion court erred in its reliance on State v. Crumb, 307 N.J. Super. 204, 243-46 (App. Div. 1997), certif. denied, 153 N.J.

12

215 (1998), which involved a different familial relationship between the parties, a different rental arrangement between those parties, and a room with only an unhinged door to provide privacy. Here, the panel determined that the motion court erred in concluding that defendant was not a tenant in his aunt's home, where this almost twenty-year-old nephew paid his aunt $250 per month in board, which the police could have discovered by inquiring. Although defendant was not always required to pay rent or risk eviction, the panel was not persuaded that the informality of the rental agreement authorized defendant's landlady to consent to a search of his room under State v. Coyle, 119 N.J. 194, 217 (1990).

In addressing the overall unreasonableness of the search, the panel noted that the police ignored "the very person with the superior right to control access to the room" -- defendant -- who was in police custody six houses away. Instead, without explanation, the police decided to obtain consent from Ms. Coles. The panel stated that the conduct of the police leading up to the search was of "questionable validity" because reasonable suspicion to continue to detain defendant had likely "evaporated" when the victim was unable to identify him as the perpetrator. Citing Georgia v. Randolph, 547 U.S. 103, 121, 126 S. Ct. 1515, 1527, 164 L. Ed. 2d 208, 226-27 (2006), the panel concluded that "defendant's continued

13

detention" in those questionable circumstances contravened federal precedent.  Using a totality-of-the-circumstances assessment, the panel held the search to be unreasonable, reversed the suppression order of the trial court and defendant's conviction, and remanded for entry of an order suppressing the evidence and further proceedings.

We granted the State's petition for certification.  State v. Coles, 212 N.J. 432 (2012).

## II.

## A.

The State seeks reversal of the Appellate Division's decision.  The State contends that Ms. Coles possessed sufficient common authority over defendant's bedroom to consent to a search of the room.  The State's argument in that respect is based on Ms. Coles's status as defendant's aunt, the fact that she had recently slept in the room, and that she had a key to the padlock mounted on the door.  Further, the State maintains that, based on the totality of the circumstances, Sergeant James's belief that Ms. Coles possessed common authority over the room was reasonable and that the search therefore was justified.

The State further argues that defendant's detention was proper and based on reasonable suspicion.  Accordingly, it maintains that the third-party consent search was legitimate

14

because defendant was not present at the scene and objecting to the search.  The State relies on Randolph, supra, 547 U.S. at 121-22, 126 S. Ct. at 1527, 164 L. Ed. 2d at 226-27, as well as the more recent decision in Fernandez, supra, 571 U.S. at ___, 134 S. Ct. at 1133-34, 188 L. Ed. 2d at 34, to support that contention.  Finally, the State disputes that Ms. Coles's consent was not knowing, voluntary, and intelligent at all stages of the search.

B.

Defendant argues that the appellate panel's decision should be affirmed because his aunt had neither actual nor apparent authority to consent to a search of his bedroom.  He asserts that he was a tenant and that he maintained exclusive control over his room.

He also contends that his detention was improper.  He argues that Sergeant James lacked reasonable suspicion when the detention began and that after the victim did not identify him there was no probable cause to continue his detention.  Therefore, the subsequent search of his room was impermissible under Randolph because the police knowingly kept defendant detained in the patrol car to avoid the possibility that he would refuse to consent to the search.  Finally, defendant argues that Ms. Coles's consent to the search was not voluntary but rather was the result of police coercion.

15

C.

The American Civil Liberties Union of New Jersey (ACLU), appearing as amicus curiae, urges this Court to affirm the appellate panel's decision.  The ACLU submits that a landlord-tenant relationship existed in this case; that Ms. Coles's limited access to the room did not alter the basic assumption that defendant maintained a reasonable expectation of privacy when he occupied his room; and that Ms. Coles's familial role as defendant's aunt does not and should not alter that assumption.  Accordingly, Ms. Coles did not possess common authority to consent to a search of defendant's room.  Further, the ACLU contends that police should not be permitted to utilize selective questioning techniques to avoid obtaining information that would undercut the appearance of common authority.  Finally, the ACLU argues that, even if Ms. Coles had the authority to consent to the search, the scope of that authority did not extend to secured containers within the room.

III.

A.

The New Jersey and Federal Constitutions guarantee the rights of persons to be free from unreasonable searches and seizures.  N.J. Const. art. I, ¶ 7; U.S. Const. amend. IV.  The Fourth Amendment and the New Jersey Constitution assure the "highest degree of protection to privacy interests within the

16

home." State v. Johnson, 193 N.J. 528, 532 (2008). Both protect against unreasonable searches and regard the warrantless entry into a person's home as "presumptively unreasonable." Id. at 552 (internal quotation marks omitted); Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639, 651 (1980).

To sustain the validity of a warrantless search, the State must demonstrate that the search fits within an accepted exception to the warrant requirement, one of which is the long-recognized consent-to-search exception. See Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44, 36 L. Ed. 2d 854, 858 (1973); State v. Domicz, 188 N.J. 285, 305 (2006).

B.

In a series of decisions dating back forty years, the United States Supreme Court has addressed the right of police officers to conduct warrantless searches of homes based on consent given by a third party. See United States v. Matlock, 415 U.S. 164, 171-72, 94 S. Ct. 988, 993, 39 L. Ed. 2d 242, 249-50 (1974) (affirming warrantless entry and search by police officers who obtained consent of person possessing common authority over premises searched); Illinois v. Rodriguez, 497 U.S. 177, 185-89, 110 S. Ct. 2793, 2800-02, 111 L. Ed. 2d 148, 159-61 (1990) (affirming search by police based on consent

17

granted by person whom police reasonably believed possessed common authority over premises to be searched).  In consent-based searches, the State bears the burden of proving that proper consent was given freely and voluntarily.  Schneckloth, supra, 412 U.S. at 223, 93 S. Ct. at 2045-46, 36 L. Ed. 2d at 860-61; State v. Johnson, 68 N.J. 349, 354 (1975).

The United States Supreme Court has relied on the test of objective reasonableness in third-party consent searches.  It was the underpinning of the apparent authority holding in Rodriguez, supra.  See 497 U.S. at 185-86, 110 S. Ct. at 2799-2800, 111 L. Ed. 2d at 159-60.  There, the actions of the police were overtly tested by that standard when consent was granted by a third party in the absence of the defendant against whom the evidence seized would be used in a criminal trial.  Ibid.

Moreover, the United States Supreme Court has held that, when faced with the circumstances of a present and objecting co-occupant, it is objectively unreasonable for police to rely on the consenting occupant.  In Randolph, supra, the Court's majority opinion, written by Justice Souter, held that the physically present co-occupant's stated refusal to permit entry prevails.  547 U.S. at 122-23, 126 S. Ct. at 1528, 164 L. Ed. 2d at 227.

In Randolph, a wife had returned to the home she shared with her husband, after she had been staying with her family for

18

several months. Id. at 106, 126 S. Ct. at 1519, 164 L. Ed. 2d at 217. She called the police to the home when her husband took their child away after a dispute erupted between the couple. Id. at 107, 126 S. Ct. at 1519, 164 L. Ed. 2d at 217. When the police arrived, she told them that her husband was a drug user and volunteered that there was evidence of that in the house. Ibid. The husband was present during this exchange and refused to grant the officers permission to search the home. Ibid. After the police searched the home pursuant to the wife's consent, the defendant moved to suppress the evidence seized during the search. The Supreme Court of Georgia sustained a reversal of an initial order of suppression and the United States Supreme Court affirmed the suppression of the seized evidence. The Supreme Court majority held that a warrantless search of shared dwelling space over the clear refusal of consent by a physically present resident is not reasonable, and required suppression of evidence that was seized on the basis of consent provided by another resident. Id. at 120, 126 S. Ct. at 1526, 164 L. Ed. 2d at 226.

The Randolph majority also addressed two "loose ends" from its prior decisions in Matlock and Rodriguez. Id. at 120-21, 126 S. Ct. at 1527, 164 L. Ed. 2d at 226. First, the Court explained that Matlock's recognition of a co-tenant's right to admit the police arises from the role that customary social

19

usage bears in assessing the reasonableness of a search under the Fourth Amendment. Ibid. The Randolph majority stated that the right to admit arises not from "property right" considerations but rather from customary social understanding of whether there is a right to admit "powerful enough to prevail over the co-tenant's objection." Ibid. Second, the Court's majority opinion noted that fine factual nuances distinguished Matlock and Rodriguez from Randolph and acknowledged the "fine line" it was drawing:

> If a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.
>
> This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection [the search may be deemed objectively reasonable].
>
> [Id. at 121, 126 S. Ct. at 1527, 164 L. Ed. 2d at 226-27 (emphasis added).]

While emphasizing a disinclination to turn every co-tenant consent case into an examination into police efforts to locate a potential objector, the Court cautioned that police cannot make a defendant unavailable for the sake of avoiding a possible objection. See id. at 121-22, 126 S. Ct. at 1527-28, 164 L. Ed.

20

2d at 226-27. That noted exception was the subject of attention in the Court's most recent opinion in this line of cases.

In Fernandez, supra, the Court reaffirmed the "touchstone" of objective reasonableness. 571 U.S. at ___, 134 S. Ct. at 1132, 188 L. Ed. 2d at 32. Fernandez also clarified that an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason, ratifying that Randolph's holding otherwise requires the presence of the objecting occupant. Id. at ___, 134 S. Ct. at 1134, 188 L. Ed. at 35. We take from Fernandez two things: (1) that the objective-reasonableness test prevails; and (2) that police responsibility for the unlawful detention or removal of a tenant who was prevented from being present at the scene to voice his or her objection to the search is not equivalent to other neutral circumstances causing the defendant's absence.

### C.

Our state law on consent searches similarly has recognized a third party's ability to consent to a search when the consenter has common authority for most purposes over the searched space. See State v. Suazo, 133 N.J. 315, 319-20 (1993) (noting Matlock and Rodriguez upholding, under federal and state constitutions, third-party consent rendering warrantless search of premises objectively reasonable). As we have explained,

21

police officers need not ultimately be factually correct about a party's ability to consent to a search.  Id. at 320.  The question is "whether the officer's belief that the third party had the authority to consent was objectively reasonable in view of the facts and circumstances known at the time of the search."  Ibid.; see also Crumb, supra, 307 N.J. Super. at 243 (upholding, as objectively reasonable, officer's warrantless search of adult son's bedroom in mother's trailer home based on mother's consent where bedroom lacked hinged door and thus provided no expectation of privacy).

The appellate panel in Crumb, supra, noted that appellate decisions from our state generally have aligned with "the overwhelming majority of [jurisdictions] in holding that a parent has the right to consent to the search of the property of his or her son or daughter."  307 N.J. Super. at 243.  In assessing the objective reasonableness in a circumstance involving an adult child living with parents, the Crumb panel discussed factors to consider when determining whether a child has exclusive possession of his or her room, such as whether the child pays rent;[5] whether the parent has access to the child's

---

[5] In a parent-child or other familial relationship, depending on the age of the child and the relationship, the typical rules governing a landlord's inability to consent to the search of a tenant's rented premises do not translate with crystalline clarity.  See State v. Scrotsky, 39 N.J. 410, 415 (1963).  Even the typical landlord, who may have a right to access the

room for cleaning or other such general access purposes; and whether the child has the right to lock the door to deny access. Id. at 245.

Ultimately, under our state law, the question remains one of objective reasonableness based on an assessment of the totality of the circumstances.

IV.

We thus turn to assess the objective reasonableness of the circumstances leading to the search of defendant's bedroom. That assessment necessarily begins with review of the seizure of defendant's person.

A.

The suppression court determined that Sergeant James had reasonable suspicion to stop and briefly detain defendant, explaining its reasoning as follows:

> The determination of the legality of the detention that followed the questioning of Defendant requires a review of the totality of the circumstances. Here, the totality of the circumstances includes: 1) the fact that Defendant was wearing practically identical clothing to that of the robbery suspect (as confirmed by the robbery victim); 2) the incongruous answers Defendant gave regarding where he had been and where he was going (and, more precisely, Sgt. James's knowledge, based on his familiarity with the area, that the answers

---

tenant's room for specific "limited purposes," does not by virtue of such authority have the ability to consent to a search. Coyle, supra, 119 N.J. at 216.

were factually suspect); and 3) Defendant's "fidgety" and "nervous" conduct as he spoke with Sgt. James, an 18-year Camden police veteran.

The Appellate Division had no quarrel with the initial stop by James, who was investigating a reported armed robbery in the neighborhood in which he encountered defendant, but the panel's review of the circumstances of the continued investigatory detention of defendant after the victim was unable to identify defendant as her assailant led it to conclude that the continued detention may have been unreasonable. We note at the outset that the Appellate Division's review was itself conducted "with substantial deference to the trial court's factual findings, which [it] 'must uphold . . . so long as those findings are supported by sufficient credible evidence in the record.'" State v. Hinton, 216 N.J. 211, 228 (2013) (omission in original) (quoting State v. Handy, 206 N.J. 39, 44 (2011)). However, a reviewing court owes no deference to the trial court's determinations as to matters of law, and those determinations are reviewed de novo. State v. Buckley, 216 N.J. 249, 260-61 (2013); State v. Schubert, 212 N.J. 295, 304 (2012).

Those standards also govern our review of the legality of defendant's detention.

B.

24

A warrantless seizure of a person is "'presumptively invalid as contrary to the United States and the New Jersey Constitutions'" unless that warrantless seizure "'falls within one of the few well-delineated exceptions to the warrant requirement.'"  State v. Mann, 203 N.J. 328, 337-38 (2010) (quoting State v. Pineiro, 181 N.J. 13, 19 (2004), and State v. Elders, 192 N.J. 224, 246 (2007), respectively).  An investigatory stop of a person -- sometimes referred to as a Terry stop -- is one such exception.  State v. Rodriguez, 172 N.J. 117, 126-27 (2002).

It is undisputed that a police officer may conduct an investigatory stop of a person if that officer has "particularized suspicion based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing."  State v. Davis, 104 N.J. 490, 504 (1986) (internal quotation marks omitted); accord Mann, supra, 203 N.J. at 338.  The stop must be reasonable and justified by articulable facts; it may not be based on arbitrary police practices, the officer's subjective good faith, or a mere hunch. See State v. Shaw, 213 N.J. 398, 411 (2012); Rodriguez, supra, 172 N.J. at 127.

There is a recognized constitutional balance to be struck between individual freedom from police interference and the legitimate and reasonable needs of law enforcement.  See Davis,

25

supra, 104 N.J. at 502 (noting that "Article I, paragraph 7 of the New Jersey Constitution 'does not speak in absolute terms but strikes a balance between the interests of the individual in being free of police interference and the interests of society in effective law enforcement'" (quoting State v. Dilley, 49 N.J. 460, 468 (1967))); see also State v. Arthur, 149 N.J. 1, 7 (1997) (noting police conduct may be "assessed by 'balancing the need to search (or seize) against the invasion which the search (or seizure) entails'" (quoting Terry, supra, 392 U.S. at 21, 88 S. Ct. at 1879, 20 L. Ed. 2d at 905)).  That balance is critical because both the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee to New Jersey's citizens "[t]he right to walk freely on the streets of a city without fear of an arbitrary arrest."  State v. Gibson, ___ N.J. ___, ___ (2014) (slip op. at 8).  When evaluating the reasonableness of a detention, the "totality of circumstances surrounding the police-citizen encounter" must be considered.  State v. Privott, 203 N.J. 16, 25 (2010) (quoting Davis, supra, 104 N.J. at 504).

    Case law has recognized law enforcement's need to respond to the fluidity of a street encounter where there is a reasonable suspicion of wrongdoing; accordingly, the duration of the investigative stop may be extended for a reasonable but limited period for investigative purposes.  See, e.g., State v.

26

Sloane, 193 N.J. 423, 426 (2008) (upholding officer's decision to search NCIC database during traffic stop because that decision "did not unreasonably prolong the stop"); State v. Herrera, 187 N.J. 493, 504 (2006) (upholding investigatory stop). The reasonableness of a continued detention is determined through application of a two-pronged inquiry. First, the detention must have been reasonable at its inception. See State v. Dickey, 152 N.J. 468, 476 (1998); Davis, supra, 104 N.J. at 504, 507. Second, the scope of the continued detention must be reasonably related to the justification for the initial interference. Dickey, supra, 152 N.J. at 476. Thus, the detention must be reasonable both at its inception and throughout its entire execution. See ibid.; United States v. Sharpe, 470 U.S. 675, 682-83, 105 S. Ct. 1568, 1573-74, 84 L. Ed. 2d 605, 613 (1985). Further, the officer must use the least intrusive means necessary to effectuate the purpose of the investigative detention, Davis, supra, 104 N.J. at 504, and the detention must "last no longer than is necessary to effectuate the purpose of the stop," Shaw, supra, 213 N.J. at 411 (quoting Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325, 75 L. Ed. 2d 229, 238 (1983)).

Our Court has recognized that "[t]here is [no] litmus-paper test for . . . determining when a seizure exceeds the bounds of an investigative stop"; instead, when the duration of the

27

detention is at issue, the proper question is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Dickey, supra, 152 N.J. at 476-77 (second alteration in original) (internal quotation marks omitted); see also State v. Baum, 199 N.J. 407, 425 (2009) (stating continued detention beyond time needed to effectuate purpose of investigative detention constituted de facto arrest).

## C.

In the matter at hand, we agree with the trial court and the Appellate Division that Sergeant James's initial stop and detention of defendant was reasonable. We have no quarrel with James's patdown of defendant or his detention of defendant to enable a showup identification to be conducted. However, once the victim of the reported armed robbery arrived for a showup and was unable to identify defendant as the perpetrator, the calculus changed.

In assessing the reasonableness of a detention's duration, we have upheld a police officer's short-term detention of a suspect for the purpose of conducting a showup identification. See, e.g., State v. Henderson, 208 N.J. 208, 259 (2011) (noting "[s]howups often occur at the scene of a crime soon after its commission"); State v. Romero, 191 N.J. 59, 78 (2007) (upholding

showup identification conducted during investigative detention). Such a brief investigative detention serves the beneficial purpose of quickly exonerating innocent suspects. See Romero, supra, 191 N.J. at 78; Herrera, supra, 187 N.J. at 504 (acknowledging showup identifications may "tend to avoid or minimize inconvenience and embarrassment to the innocent"). In that respect, it is a trade-off. By detaining an individual for whom probable cause to arrest is lacking in order that a showup might take place, the person exonerated by the showup is able to be on his or her way without the delay and inconvenience of being brought to headquarters and being required to submit to a line-up. See Herrera, supra, 187 N.J. at 504 (discussing utility of showup identifications). In other words, the exonerated person is not to be subjected to further detention.

A continued detention must conform to the constitutional requirement of the reasonableness standard that governs all investigative stops. If an officer's conduct is unnecessarily intrusive or if the suspect is detained for a period beyond what can be considered reasonable, a de facto arrest occurs. See Dickey, supra, 152 N.J. at 478. Once a de facto arrest occurs, the particularized suspicion that originally supported the investigative detention is no longer sufficient and the arrest must be supported by probable cause. See Gibson, supra, ___ N.J. at ___ (slip op. at 8) ("A person cannot be arrested unless

29

there is probable cause to believe that he has committed or is committing an offense.").  An arrest unsupported by probable cause constitutes an "unreasonable seizure in violation of both the Federal and State Constitutions."  Ibid.

Here, defendant was prevented from going on his way after the showup failed to develop probable cause to arrest him.[6] James continued to detain defendant because defendant did not have any identification documents on him to prove that he was Byseem Coles and that he lived where he said that he did.  While individuals are not required to carry identifying documents on them at all times in our free country, we accept that law enforcement acting under reasonable suspicion of an individual can expend a brief but reasonable period of time to confirm an individual's identity in circumstances as presented here.  Our case law has recognized a reasonable and brief interlude of time to permit such identifications to take place.  See, e.g., Handy, supra, 206 N.J. at 47 (finding no quarrel with officer's extension of investigatory stop of suspect to ascertain identity); Sloane, supra, 193 N.J. at 437 (finding officer's running of NCIC check and driver's license check reasonable during traffic stop); State v. Nishina, 175 N.J. 502, 513 (2003)

---

[6] At oral argument the State acknowledged that it lacked probable cause to arrest defendant after the showup did not result in defendant's identification as the perpetrator of the armed robbery under investigation.

(holding officer "was justified in continuing to question defendant," including asking for identification).

Therefore, we allow that Sergeant James had the flexibility to seek confirmation of defendant's identity, as defendant had suggested to James, from defendant's relatives who were reportedly at his nearby home. We further do not propose to hamstring the police officers' on-the-scene determination to keep defendant detained in the patrol car while two officers approached the door of the home to which defendant directed them. Where we do part ways with the reasonableness of the police officers' conduct is with what transpired at the doorway.

At the threshold to the home, in an exchange with defendant's aunt, the officers dropped their suspicion of whether defendant was who he said he was -- Byseem Coles. Their actions demonstrated that they had confirmed his identity and that he lived there because they commenced a concerted course of action to secure defendant's aunt's permission to let them search his bedroom. However, in accepting those beliefs as to defendant's identity and residence, the officers no longer had sufficient legal reason to continue his detention. At that point, defendant's continued police detention was no longer lawful.

The upshot of that alteration in the legality of the police detention of defendant is that the State cannot claim that James

31

secured a valid consent to search defendant's room from his aunt. The validity of this consent-premised search turns on the objective reasonableness of the police conduct based on the totality of the circumstances.

As the United States Supreme Court's Fernandez opinion makes clear, valid third-party consent is subject to the exception that the third party's consent cannot be manufactured through the unlawful detention of the defendant. That is what occurred here. Defendant was being unlawfully detained the moment the last vestige of a valid, continued investigatory detention had been resolved through confirmation of his identity and residence. At that point, he was entitled to be released. But, he was not. Rather, his detention continued while an officer questioned his aunt and obtained her consent rather than defendant's to the search of his bedroom. The objective reasonableness of this asserted consent-based search ends with our conclusion that defendant was being unlawfully detained by police, a few houses away from his home, as soon as the officers at the doorway of his home transferred their focus from securing confirmation of defendant's identity to securing unilateral consent from defendant's aunt for the search of defendant's room.

We need not address whether defendant's aunt's authority, standing alone, was sufficient to grant the officers access to

the private bedroom of this young adult male living, as so many people do, in an extended-family living arrangement. We note only that, in such settings, personal privacy rights are not easily assessed through any uniform set of questions. We decline to parse the thoroughness of the officer's questioning of the aunt, and his judgment based on her on-the-scene answers because, in the totality of these circumstances, this asserted consent-based search went off the rails of objective reasonableness once the officer began to secure consent from her. The officer's action detaining defendant in a patrol car when probable cause to arrest was lacking effectively prevented any objection from defendant. It also prevented him from disputing his aunt's statements in response to police inquiries about control over the room.

We conclude that the objective reasonableness of this asserted consent-based search founders on the unlawfulness of the police detention of defendant in the totality of these circumstances. See Suazo, supra, 133 N.J. at 320 (adopting test of objective reasonableness based on totality of circumstances for asserted third-party consent searches of homes). Under the totality of these circumstances, we hold that the warrantless search of defendant's bedroom was not objectively reasonable, and we base our holding on the protection provided by Article I, Paragraph 7 of the New Jersey Constitution against unreasonable

33

searches of one's home and personal living space.  See Evers,

supra, 175 N.J. at 384 (granting privacy interests in home "the

highest degree of respect and protection in the framework of our

constitutional system").

Although our decision is based on state constitutional law,

our holding is bolstered by Fourth Amendment principles.

Federal case law also supports the conclusion that a warrantless

consent-based search is objectively unreasonable and

unconstitutional when premised on a defendant's illegal

detention.  See Fernandez, supra, 571 U.S. at ___, 134 S. Ct. at

1134, 188 L. Ed. 2d at 35.

V.

The judgment of the Appellate Division is affirmed as

modified by this opinion.

CHIEF JUSTICE RABNER and JUSTICE ALBIN, and JUDGES
RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE
LaVECCHIA's opinion.  JUSTICE PATTERSON filed a separate,
dissenting opinion.

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

       v.

BYSEEM T. COLES,

    Defendant-Respondent.

    JUSTICE PATTERSON, dissenting.

    In its recent decision in Fernandez v. California, 571 U.S. ___, 134 S. Ct. 1126, 188 L. Ed. 2d 25 (2014), the United States Supreme Court confirmed that an occupant's consent to a police search of a residence is effective unless a co-tenant who is present at the scene objects to the search.  The Supreme Court reaffirmed its holding in Georgia v. Randolph, 547 U.S. 103, 106, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006), and settled a debate about the reach of that decision.  Following Fernandez, supra, federal search and seizure law regarding this issue is clear: unless there is an objecting co-tenant present at the scene, or evidence that police removed a co-tenant from the residence to avoid a potential objection, the consent of a person with appropriate authority authorizes the warrantless

search of a residence.  571 U.S. at ___, 134 S. Ct. at 1134-35, 188 L. Ed. 2d at 35.

In this case, there was no objecting co-tenant present at the scene.  The police did not remove defendant from his home to forestall a potential objection; defendant was detained elsewhere and was not at his home when the search was consented to and conducted.  Accordingly, this case does not present a setting akin to Randolph, the narrow parameters of which were underscored by the Supreme Court in Fernandez.  With the scope of Randolph having been clarified by Fernandez, it is clear that this case is not within the limitations of Randolph and that the police search of defendant's home simply did not run afoul of the Fourth Amendment.

Nonetheless, the majority holds that by virtue of an unlawful detention of defendant a short distance away from the residence at issue, the consent of defendant's aunt, Thelma Coles, did not authorize the search of her home, and that defendant's motion to suppress should have been granted.  In so doing, the majority does not expressly state that it diverges from the federal constitutional principles recently articulated in Fernandez.  Although the majority premises its holding on Article I, Paragraph 7 of the New Jersey Constitution, it finds support for its decision in the Supreme Court's pronouncement in

2

Fernandez, which it interprets to hold that a consent-based search is unconstitutional "when premised on defendant's illegal detention," no matter where that detention occurs. Ante at ___ (slip op. at 4).

In my view, the majority's holding simply cannot be squared with federal precedent. In the wake of Fernandez -- in which the Supreme Court adamantly limited Randolph to cases involving a co-tenant who is first present at, and then removed from, the scene -- the majority nonetheless construes Randolph to govern a setting devoid of that dispositive factor. Because I do not concur with the majority's interpretation of federal law, or its substantial expansion of New Jersey search and seizure protections beyond Fourth Amendment parameters, I respectfully dissent.

I.

The United States Supreme Court's decision in Fernandez is the latest in a series of opinions addressing the impact of consent given by a person with authority over the premises to the search of a shared home. As the majority notes, the first such opinion was United States v. Matlock, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). There, the Supreme Court upheld a warrantless, consent-based search of a defendant's home based on the voluntary consent of a woman with whom the

3

defendant lived after the defendant was arrested in his front yard and placed in a squad car.  Id. at 166, 169, 94 S. Ct. at 991, 992, 39 L. Ed. 2d at 247, 248.  The Supreme Court held that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared."  Id. at 170, 94 S. Ct. at 993, 39 L. Ed. 2d at 249.  The Supreme Court later applied that principle set forth in Matlock to permit a search "based upon the consent of a third party whom the police, at the time of the entry, reasonably believe[d] . . . possess[ed] common authority over the premises, but who in fact d[id] not do so."  Illinois v. Rodriguez, 497 U.S. 177, 179, 186, 110 S. Ct. 2793, 2796, 2800, 111 L. Ed. 2d 148, 155, 160 (1990).

The sole exception to the rule of Matlock was defined by the Supreme Court in Randolph.  There, the defendant was present at his home shortly after police arrived in response to a complaint of a domestic dispute.  Randolph, supra, 547 U.S. at 107, 126 S. Ct. at 1519, 164 L. Ed. 2d at 217.  Although the defendant's wife advised police that her husband used drugs and "volunteered that there were items of drug evidence in the house," the defendant "unequivocally refused" to consent to a search of his home.  Ibid.  (internal quotation marks omitted).  Police then turned to the defendant's wife for consent, "which

4

she readily gave." Ibid. The Supreme Court held that the evidence generated by the search should have been suppressed, stating that in the circumstances presented, "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." Id. at 106, 126 S. Ct. at 1518-19, 164 L. Ed. 2d at 217. In a passage quoted by the majority here, the Supreme Court distinguished between a potential objector with self-interest in objecting who "is in fact at the door" objecting, and a potential objector who is "nearby but not invited to take part in the threshold colloquy." Id. at 121, 126 S. Ct. at 1527, 164 L. Ed. 2d at 226. The former, ruled the Supreme Court, wins the argument; the latter "loses out." Ibid.

If the Supreme Court in Randolph left some uncertainty as to whether its holding would afford Fourth Amendment protections to a potential objector who is not "in fact at the door" because he is unlawfully detained elsewhere, there is no longer any such uncertainty after Fernandez. Although the majority cites Fernandez for the general proposition that the objective reasonableness test governs this Fourth Amendment analysis and that police control over the whereabouts of an absent tenant is distinct from neutral causes of that absence, the Supreme

5

Court's holding actually stands for much more.  Indeed, it directly addresses the issue presented in this case.

Fernandez, supra, arose in the context of a police investigation into an alleged robbery.  571 U.S. at ___, 134 S. Ct. at 1130, 188 L. Ed. 2d at 30.  When officers arrived at the scene, they observed a man who was later identified as the defendant run through an alley and into an apartment building.  Id. at ___, 134 S. Ct. at 1130, 188 L. Ed. 2d at 31.  Shortly thereafter, the officers "heard sounds of screaming and fighting coming from that building."  Ibid.  The officers went to the apartment door, where they were met by a crying and apparently battered woman.  Ibid.  They asked the woman to step away from the door so that they could conduct a protective sweep.  Ibid.  Prior to entering, however, the officers immediately encountered the "[a]pparently agitated" defendant, who vehemently objected to their entry.  Ibid.  Suspecting that the defendant had assaulted the woman, the officers removed the defendant from the apartment, arrested him, and returned an hour later to search the apartment with the woman's consent.  Ibid.

The defendant in Fernandez argued that his case fit within the parameters of Randolph, contending that "his absence should not [have] matter[ed] since he was absent only because the police had taken him away."  Id. at ___, 134 S. Ct. at 1134, 188

6

<u>L. Ed.</u> 2d at 35.  He also contended that "it was sufficient that he objected to the search while he was still present," asserting that his objection "should remain in effect until the objecting party no longer wishes to keep the police out of his home." <u>Ibid.</u> (internal quotation marks omitted).  Rejecting both arguments, the Supreme Court made clear that the touchstone of <u>Randolph</u> was the physical presence of the objecting occupant at the premises when the police sought consent for, and conducted, the search.  <u>Id.</u> at ___, 134 <u>S. Ct.</u> at 1134-35, 188 <u>L. Ed.</u> 2d at 35.  Writing for the majority, Justice Alito confirmed that an authorized occupant's consent to search is vitiated only by the objection of a co-tenant present at the scene, or by the police removal of a co-tenant who was initially at home when the police arrived, but was removed from the premises in an apparent effort to forestall an objection.  <u>Ibid.</u>  The Court noted:

> Our opinion in <u>Randolph</u> took great pains to emphasize that its holding was limited to situations in which the objecting occupant is physically present.  We therefore refuse to extend <u>Randolph</u> to the very different situation in this case, where consent was provided by an abused woman well after her male partner had been removed from the apartment they shared.
>
> [<u>Id.</u> at ___, 134 <u>S. Ct.</u> at 1130, 188 <u>L. Ed.</u> 2d at 30.]

Citing a litany of references in <u>Randolph</u> to the physical presence of the objecting defendant, the Supreme Court

7

emphasized in Fernandez that its "opinion [in Randolph] went to great lengths to make clear that its holding was limited to situations in which the objecting occupant is present.  Again and again, the opinion of the Court stressed this controlling factor."  Id. at ___, 134 S. Ct. at 1133-34, 188 L. Ed. 2d at 34.

Accordingly, the Supreme Court held that "[t]he Randolph holding unequivocally requires the presence of the objecting occupant in every situation other than the one mentioned in the dictum discussed above."  Id. at ___, 134 S. Ct. at 1134-35, 188 L. Ed. 2d at 35.  Importantly, the Supreme Court defined the Randolph dictum as constrained to the precise situation that it had addressed in that case.  It found that consent by one occupant is sufficient as long as there is no "evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection."  Id. at ___, 134 S. Ct. at 1134, 188 L. Ed. 2d at 35 (quoting Randolph, supra, 547 U.S. at 121, 126 S. Ct. at 1527, 164 L. Ed. 2d at 226-27).  Thus, the United States Supreme Court drew a bright line.  It distinguished a co-tenant present at the scene -- who either directly asserts an objection to a police search or is initially present and then removed from his home by police to avoid a confrontation -- from all other objecting occupants of

homes searched by virtue of a co-tenant's consent.  Id. at ___, 134 S. Ct. at 1134-35, 188 L. Ed. 2d at 35.

In Fernandez, the Supreme Court further illuminated the distinction between present and absent co-tenants by commenting on the functional impact of the rule urged by the defendant in that case.  Id. at ___, 134 S. Ct. at 1135-36, 188 L. Ed. 2d at 36.  Dismissing the defendant's contention that the prior objection of an absent occupant should remain in effect for a "reasonable" time, the Supreme Court noted the risk of miscommunication, confusion and uncertainty that would arise if an absent occupant's objections were held to negate a co-tenant's valid consent.  Id. at ___, 134 S. Ct. at 1135-36, 188 L. Ed. 2d at 36-37.  It held that "[i]f Randolph is taken at its word -- that it applies only when the objector is standing in the door saying 'stay out' when officers propose to make a consent search -- all of these problems disappear."  Id. at ___, 134 S. Ct. at 1136, 188 L. Ed. 2d at 37.  The Supreme Court thus construed its prior holding in Randolph as unmistakably requiring either the objector's personal presence at his or her home at the time of his or her objection, or his or her removal from the residence during an encounter with police, before the officers sought the co-tenant's consent, as in Randolph.  The United States Supreme Court chose a stark and simple test,

9

identifying as the "controlling factor" for purposes of the Fourth Amendment "situations in which the objecting occupant is present" at the home.  Id. at ___, 134 S. Ct. at 1133, 188 L. Ed. 2d at 34.

In my view, this case clearly falls outside of the narrow category of situations defined by the Supreme Court in Randolph and Fernandez.  Here, the potentially objecting occupant was not present at the home when the police arrived, or at any time during the search.  Defendant was detained away from his residence and it was only after his detention that he provided the police with the name and address of his aunt.  He was absent during the police communications with his aunt that led to her consent to the search of the residence.  The Fernandez rule -- which requires an objector to be present on the scene in order for the valid consent of a co-tenant to be nullified -- is simply not satisfied on these facts.

In short, following Fernandez, I cannot reconcile the majority's holding with the United States Supreme Court's jurisprudence on this issue.  To the extent that the majority concludes that its decision is supported by federal search and seizure jurisprudence, I respectfully disagree.

II.

10

Until this decision, this Court has interpreted the protection afforded by Article I, Paragraph 7 of the New Jersey Constitution with respect to the issue before the Court to be coextensive with the reach of the Fourth Amendment. This Court and the Appellate Division have repeatedly adopted and applied the principles of Matlock, supra, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 and Rodriguez, supra, 497 U.S. 177, 110 S. Ct. 2793, 111 L. Ed. 2d 148 in a variety of settings. See, e.g., State v. Maristany, 133 N.J. 299, 305 (1993) (stating, in reliance on Matlock and Rodriguez, that "[c]onsent may be obtained . . . from a third party who possesses common authority over the property, or from a third party whom the police reasonably believe has authority to consent") (internal citations omitted); State v. Suazo, 133 N.J. 315, 320-21 (1993) (same); State v. Coyle, 119 N.J. 194, 215 (1990) (stating, in reliance on Matlock, that third party with common authority over residence can consent to search); State v. Crumb, 307 N.J. Super. 204, 243 (App. Div. 1997) (same), certif. denied, 153 N.J. 215 (1998).

Indeed, in our unanimous decision on a residential consent search in State v. Lamb, ___ N.J. ___ (2014), issued today, we interpret our jurisprudence to be guided by and consistent with Randolph and Fernandez. Lamb arose from a setting different

11

from that of this case.  There, an initially objecting co-tenant was present at the scene, and then left the house, never renewing his objection.  Id. at ___ (slip op. at 2).  It raises, however, the same general issue as this case: the constitutionality of a search conducted with the consent of one occupant in light of the potential objection of another occupant who shares authority over the premises.  Id. at ___ (slip op. at 9-10).  Relying on the United States Supreme Court's decisions in Fernandez and Randolph, the Court in Lamb rejected the defendant's argument that his stepfather's objection to a search consented to by his mother required suppression.  Id. at ___ (slip op. at 23-25).  The Court applied Fernandez to reject the defendant's expansive interpretation of Randolph.  Id. at ___ (slip op. at 25).

Thus, in my view, the Court has properly embraced and applied the United States Supreme Court's analysis of this issue in cases other than this one, up to and including today's decision in Lamb.  As this Court has noted, "we proceed cautiously before declaring rights under our state Constitution that differ significantly from those enumerated by the United States Supreme Court in its interpretation of the federal Constitution."  Right to Choose v. Byrne, 91 N.J. 287, 301 (1982) (citing State v. Hunt, 91 N.J. 338, 344-45 (1982)).  That

12

"caution emanates, in part, from our recognition of the general advisability in a federal system of uniform interpretation of identical constitutional provisions." Ibid. In the search and seizure setting, "enforcement of criminal laws in federal and state courts, sometimes involving the identical episodes, encourages application of uniform rules." Hunt, supra, 91 N.J. at 345.

When it has decided to afford more expansive rights under the New Jersey Constitution than exist in federal law in a search and seizure case, this Court has identified its reasons for concluding that the decisions of the United States Supreme Court do not adequately vindicate the constitutional right at issue. See, e.g., State v. Brown, 216 N.J. 508, 528-29 (2014) (stating New Jersey's rule regarding standing to file motion to suppress); State v. Novembrino, 105 N.J. 95, 157-58 (1987) (declining to recognize good-faith exception to exclusionary rule); Hunt, supra, 91 N.J. at 345 (articulating "[s]ound policy reasons" for departure from federal law with respect to police access to telephone billing records). This case, I respectfully submit, presents no reason for New Jersey search and seizure law to deviate from Fourth Amendment jurisprudence. Consistent with the standard of objective reasonableness that governs Fourth Amendment analysis, the Supreme Court's holdings in Randolph and

*Fernandez* require police officers to respect a present occupant's manifest objection to a search, but do not compel them to engage in speculation about what an absent person would have done or said, had he or she been at home when police arrived. With no "objector . . . standing in the door saying 'stay out,'" in this case, *Fernandez*, *supra*, 571 U.S. at ___, 134 S. Ct. at 1136, 188 L. Ed. 2d at 37, the majority necessarily assumes that had he been released, defendant would have returned home immediately and objected to the search of the residence -- notwithstanding the consent of his aunt, who was evidently the senior member of a three-generation household. In my view, given the rapid decisions that must be made by law enforcement as an investigation unfolds, the majority's opinion risks miscommunication and introduces uncertainty, which is precisely what the Supreme Court sought to eliminate with the bright-line rule announced in *Fernandez*.

In sum, I would interpret Article I, Paragraph 7 in alignment with the Fourth Amendment analysis set forth in *Randolph* and *Fernandez*, and would accordingly reverse the Appellate Division's determination. I respectfully dissent.

14

SUPREME COURT OF NEW JERSEY

NO. A-15                    SEPTEMBER TERM 2012

ON CERTIFICATION TO        Appellate Division, Superior Court


STATE OF NEW JERSEY,

     Plaintiff-Appellant,

          v.

BYSEEM T. COLES,

     Defendant-Respondent.


DECIDED            May 19, 2014
Chief Justice Rabner                           PRESIDING
OPINION BY         Justice LaVecchia
CONCURRING/DISSENTING OPINIONS BY
DISSENTING OPINION BY       Justice Patterson

| CHECKLIST | AFFIRM AS MODIFIED | REVERSE |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | | X |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | | 1 |

1