# RECORD IMPOUNDED

## NOT FOR PUBLICATION WITHOUT THE
## APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5938-17T1

J.R.M.,

    Plaintiff-Respondent,

v.

S.A.M.,

    Defendant-Appellant.

_____

Argued June 25, 2019 – Decided October 15, 2019

Before Judges Rothstadt and Suter.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FV-20-1718-18.

Damiano Marcello Fracasso argued the cause for appellant.

Kathleen B. Estabrooks argued the cause for respondent.

PER CURIAM

Defendant S.A.M. appeals from the Family Part's August 24, 2018 order granting her former husband, plaintiff, J.R.M. a Final Restraining Order (FRO) and awarding attorney's fees against her under the Prevention of Domestic Violence Act of 1991 (PDVA), N.J.S.A. 2C:25-17 to -35. The trial judge entered the order after finding that defendant had committed the predicate act of harassment, N.J.S.A. 2C:33-4(c), by following plaintiff and taking pictures of him, his wife, and her children while at the boardwalk in Point Pleasant.

On appeal, defendant argues that the judge's order should be reversed because his finding of a predicate act under the PDVA was unsupported by the evidence as a "matter of law," and because "plaintiff failed to prove that relief under the PDVA [was] necessary to prevent further abuse." In addition, she contends that the judge erred by awarding attorney's fees and requiring that they be paid within sixty days. We agree with defendant's contentions about the lack of evidence to support the trial judge's conclusions and we reverse his determination.

The parties were married in 1996 and had two children, who at the time of the alleged domestic violence incident were both emancipated and estranged from plaintiff. The parties were divorced in 2016 and at the time of the alleged

A-5938-17T1

domestic violence incident, plaintiff, who had remarried, lived in Cranford with his wife and her children. Defendant resided in Pennsylvania.

Three days before the day of the incident, the parties' son had graduated from high school and became emancipated. According to plaintiff, defendant had alienated their son from him, as determined by a court in Pennsylvania, and she became upset about the anticipated loss of child support.[1] At that time, defendant began texting and emailing plaintiff, even though he had mailed her a May 2017 letter telling her to "cease and desist" from contacting him.

The alleged harassment took place on June 18, 2018, beginning at 2:00 p.m. in Point Pleasant. Plaintiff and his new family arrived to spend the day on the boardwalk and beach before taking his twelve-year-old stepdaughter to a Girl Scouts event. Soon after his arrival, plaintiff realized defendant was in Point Pleasant after he saw defendant's car parked on the street. Upon seeing her vehicle, plaintiff took photographs of her parked car and proceeded to the boardwalk.

---

[1] Earlier, a Pennsylvania court entered an order acknowledging the son's anticipated emancipation and directed that a hearing be scheduled to address plaintiff's contention that defendant did not comply with earlier parenting time orders even though those orders expired with the son's emancipation.

A-5938-17T1

At approximately 4:00 p.m., plaintiff observed defendant and their adult daughter on the boardwalk. Plaintiff believed he saw them taking photographs of him and his new family, although no photographs from the incident were ever produced. There was also no verbal or physical confrontation between plaintiff, defendant, or their daughter. Although she knew defendant was in the area, plaintiff's wife became panicked and petrified upon seeing defendant, whom the wife believed to be unstable. Nevertheless, plaintiff and his wife felt safe knowing the Girl Scouts were nearby and allowed the stepdaughter to play on the rides until it was time to leave.

Plaintiff's wife believed defendant knew in advance about their plan to go to Point Pleasant. According to plaintiff's wife, she had informed her former spouse they were going to Point Pleasant and he then told defendant about their plans. According to plaintiff's wife, her former spouse and defendant were friendly. Her former spouse, however, denied advising defendant that his former wife, plaintiff, and the children would be in Point Pleasant on that day.

Although plaintiff claimed he filed a police report with the Point Pleasant Police Department after the incident, he did not possess a copy of the report and he did not seek a restraining order that day. During the days following the incident, the parties exchanged texts and emails about defendant's behavior.

4

The day after the incident, defendant and her son got into an argument that resulted in his leaving the house and going to plaintiff's home, after the son called plaintiff to pick him up that day. When plaintiff arrived to pick up his son, he did so with a police escort.

On June 21, 2018, plaintiff obtained a temporary restraining order from the Family Part based upon the allegations of a complaint he filed that day. In his complaint, plaintiff stated that defendant committed the predicate act of harassment by "dodging behind cars, hiding behind the games [on the boardwalk], and appeared to be taking photos of the plaintiff and his family."

The complaint also addressed what was alleged to be a past history of domestic violence. It stated that from 2014 to 2018, defendant had "subjected [him] to thousands of harassing and threatening emails . . .[,] plaintiff was forced to file a 'cease and desist' order[2] against the defendant [that defendant] ignored . . . and continued to email" plaintiff. The complaint also set forth specific incidents in 2012 when defendant allegedly strangled him and threw items around their house. It further alluded to "past disputes" during which defendant grabbed plaintiff "around the neck and/or slapped [him] on the back

---

[2] No such order existed. The allegation actually referred to the May 2017 letter plaintiff sent to defendant.

A-5938-17T1

of the head." The complaint also stated that defendant threatened "to kill herself;" "conveyed threats to harm and/or kill" him; and "damaged household items."

The matter came before the trial judge for a trial on the FRO on July 12, 2018. At trial, plaintiff was represented by counsel. Defendant was self-represented. Plaintiff, his wife, and her former spouse testified for plaintiff. Defendant, her adult daughter, and defendant's mother testified on her behalf. Defendant's mother's testimony related specifically to her grandson's involvement with counseling and the parties' dispute regarding his therapy.

Plaintiff testified to his version of what occurred and to the emails and texts he received from defendant. According to plaintiff, those communications related to defendant's demands for payment of child support, threats that plaintiff would not see his children, and wishes that he was dead. He also described phone calls he alleged defendant made to him at all hours about her wanting him to pay for things for their children. The trial judge admitted ten emails and texts as examples of the alleged thousands of emails sent by defendant. Those emails primarily related to the parties' parenting issues as to their son.

After considering the testimony and the documents admitted into evidence, the judge placed his findings on the record. The judge concluded that

plaintiff had met his burden of proof. The judge identified harassment as the predicate offense pled by plaintiff and noted his testimony about "a prior history of domestic violence, or harassing behavior."

The judge also described the dispute concerning the parties' son, as testified to by defendant and her mother, as an intervening action. The issue involved the son's reunification with plaintiff, whether defendant was obstructing that process, and the son's emancipation upon graduation from high school that resulted in the termination of child support which, according to the judge, "caused some upset between the plaintiff and the defendant" on June 18. However, the judge later corrected himself, stating that the date of the argument was actually June 15, pre-dating the June 18 incident.

The judge then stated that he reviewed all the emails exchanged between the parties and he found their behavior was getting worse over time. He described the contents as "name calling" and "accusations." He turned to an email from January 10, 2018, two years after the divorce, in which defendant stated to plaintiff they were never going to reach a point of being "civil" with each other. He also found that while there "was some testimony about physical violence, there wasn't much, if any, testimony about physical violence, . . . and there's no documentary or other proof of that."

A-5938-17T1

He established plaintiff's continuing fear of defendant by relying upon plaintiff choosing to have the police accompany him the day after the incident when he picked up his son. According to the judge, that indicated plaintiff had a level of fear or concern about the reprisal. The judge credited plaintiff's testimony by stating that "he believes he needs an FRO because he fears for the safety of himself, his wife . . . and his three stepchildren . . . as a result of the defendant's actions." He found that the plaintiff's wife was very concerned about her children and found that she became panicked and immediately wanted to leave upon seeing defendant at the boardwalk.

After reviewing each of the witnesses' testimony, the judge placed his conclusions on the record. He stated the following:

> If I were to look at the incident of June 18 in a vacuum, I would question whether it is sufficient to constitute a predicate act of domestic violence. But I'm not allowed to do that because the statute tells me I've gotta look at the allegation in conjunction with the history of domestic violence. And I don't think that there is much . . . doubt in my mind that, taken in conjunction, there is sufficient proof, under 2C:33-4(c), of . . . an act of harassment having occurred because I do believe that the defendant, with the purpose to harass the plaintiff, engaged in a course of alarming conduct of repeatedly committed acts with the purpose to alarm or seriously annoy.

The judge concluded that there was a "purpose on the part of the defendant to harass the plaintiff in this case."

The judge then addressed the factors under Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006), and found that the emails and text messages gave rise to a need for a FRO because plaintiff did not want to receive those emails and text messages.

The judge entered the FRO on July 12, 2018. Later, after submissions were made by counsel, the judge entered an amended FRO on August 24, 2018, which included an award of counsel fees in the amount of $4469 in favor of plaintiff and against defendant as an element of damages under the PDVA. This appeal followed.

Our review of a Family Part judge's granting of an FRO is limited. We accord "great deference to discretionary decisions of Family Part judges" given the "family courts' special jurisdiction and expertise in family matters." G.M. v. C.V., 453 N.J. Super. 1, 11 (App. Div. 2018) (first quoting Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012); and then quoting N.J. Div. of Youth and Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010)). When reviewing "a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based

A-5938-17T1

upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). We do "not disturb the 'factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins., 65 N.J. 474, 484 (1974)). Deference is particularly appropriate when the evidence is testimonial and involves credibility issues because the judge who observes the witnesses and hears the testimony has a perspective that the reviewing court does not enjoy. Pascale v. Pascale, 113 N.J. 20, 33 (1988). However, we owe no deference to a Family Part judge's legal conclusions. See S.D. v. M.J.R., 415 N.J. Super. 417, 430 (App. Div. 2010) (citing Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995)) ("We, of course, review the judge's legal conclusions de novo.").

In determining whether to issue an FRO, the court first must determine whether the plaintiff has established, by a preponderance of the evidence, that the defendant has committed a predicate act of domestic violence as defined in N.J.S.A. 2C:25-19(a). Silver, 387 N.J. Super. at 125. The PDVA defines domestic violence by referring to a list of predicate offenses found within the

10

New Jersey Criminal Code. J.D. v. M.D.F., 207 N.J. 458, 473 (2011). "[T]he commission of a predicate act, if the plaintiff meets the definition of a 'victim of domestic violence,' constitutes domestic violence . . . ." Ibid. (quoting N.J.S.A. 2C:25-19(d)).

If the court determines a plaintiff established, by a preponderance of the evidence, that the defendant has committed a predicate act of domestic violence as defined in N.J.S.A. 2C:25-19(a), it must then consider the factors enumerated in N.J.S.A. 2C:25-29(a)(1) to (6),[3] to determine whether an FRO is necessary

---

[3] The factors are:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and
>
> (6) The existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a)(1) to (6).]

A-5938-17T1

"to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 125-27; see also A.M.C. v. P.B., 447 N.J. Super. 402, 414 (App. Div. 2016). "Commission of a predicate act is necessary, but alone insufficient, to trigger relief provided by the [PDVA]." R.G. v. R.G., 449 N.J. Super. 208, 228 (App. Div. 2017). The mere finding of a predicate act of domestic violence, standing alone, is insufficient to support the issuance of an FRO. Kamen v. Egan, 322 N.J. Super. 222, 227 (App. Div. 1999).

Whether a plaintiff has established an act of domestic violence has occurred is not determined in a vacuum. As we have stated:

> The law mandates that acts claimed by a plaintiff to be domestic violence must be evaluated in light of the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment and physical abuse and in light of whether immediate danger to the person or property is present. N.J.S.A. 2C:25-29(a)(1) and (2). This requirement reflects the reality that domestic violence is ordinarily more than an isolated aberrant act and incorporates the legislative intent to provide a vehicle to protect victims whose safety is threatened. This is the backdrop on which defendant's acts must be evaluated.
>
> [R.G., 449 N.J. Super. at 228-29 (quoting Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995)).]

Applying these guiding principles, we first examine whether the record demonstrates, by a preponderance of the evidence, that defendant committed a

predicate act of domestic violence. Here, the judge considered whether plaintiff proved harassment, N.J.S.A. 2C:33-4(c), a predicate act under the PDVA. N.J.S.A. 2C:25-19(a). Harassment occurs when a person, with the purpose to harass another, "[e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." N.J.S.A. 2C:33-4(c). A finding of harassment requires proof the defendant acted with a purpose to harass. See Silver, 387 N.J. Super. at 124. Although a purpose to harass may, in some cases, be "inferred from the evidence" and from "[c]ommon sense and experience," a finding by the court that the defendant acted with the purpose or intent to harass another is integral to a determination of harassment. State v. Hoffman, 149 N.J. 564, 576-77 (1997). There must be proof that a defendant's conscious object was to "harass," that is, "annoy," "torment," "wear out," and "exhaust." State v. Castagna, 387 N.J. Super. 598, 607 (App. Div. 2006) (quoting Webster's II New College Dictionary 504 (1995)).

Merely knowing that someone would be annoyed, as opposed to having a conscious objective to annoy, is insufficient to prove a purpose to harass. See State v. Fuchs, 230 N.J. Super. 420, 428 (App. Div. 1989). Moreover, a "victim's

13                                                                          A-5938-17T1

subjective reaction alone will not suffice; there must be evidence of the improper purpose." J.D., 207 N.J. at 487.

N.J.S.A. 2C:33-4(c) "was never intended to protect against the common stresses, shocks, and insults of life that come from exposure to crude remarks and offensive expressions, teasing and rumor mongering, and general inappropriate behavior. The aim of subsection (c) is not to enforce a code of civil behavior or proper manners." State v. Burkert, 231 N.J. 257, 285 (2017).

In Burkert, the Court held, as it did twenty years ago in Hoffman, 149 N.J. at 580-81, "[t]hat the primary thrust of N.J.S.A. 2C:33-4(c) is not to interdict speech, but rather conduct . . . ." Id. at 273. Therefore, the Court "construe[d] the terms 'any other course of alarming conduct' and 'acts with purpose to alarm or seriously annoy' as repeated communications directed at a person that reasonably put that person in fear for his safety or security or that intolerably interfere[d] with that person's reasonable expectation of privacy." Id. at 284-85 (emphasis added).

Applying these principles, we cannot conclude from the judge's findings that defendant engaged in a "course of alarming conduct" or acts that rose to the level of what the Legislature intended as "domestic violence" under the PDVA. In this case, defendant allegedly took photographs of plaintiff and his family in

14

public.  Defendant's acts, even considered against the backdrop of the alleged transmittal of texts and emails containing nasty marital contretemps over the years, while obviously inappropriate, simply did not constitute a "course of alarming conduct" or the invasion of privacy necessary to sustain the entry of the FRO.  See State v. Sloane, 193 N.J. 423, 435 (2008) (quoting Doe v. Poritz, 142 N.J. 1, 28 n.8 (1995) (stating a person "has no reasonable expectation of privacy in his . . . photograph")).

The statute prohibiting harassment is intended to criminalize "repeated threats or menacing communications that reasonably place a person in fear for his safety or security" or actions such as "repeated[] . . . unwanted communications . . . thereby intolerably interfering with [a victim's] reasonable expectation of privacy."  Id. at 285.  Here, defendant never threatened plaintiff's safety, security, or privacy by taking photographs in public and her emails and texts, like plaintiff's, were unkind but not threatening or alarming as contemplated by the statute.  Under these circumstances, we conclude that defendant's acts as found by the trial judge were insufficient to establish the alleged predicate act.

Even if this were not the case, the FRO would still have to be reversed because the judge did not find a FRO was necessary to protect plaintiff "from

an immediate danger or to prevent further abuse."  Silver, 387 N.J. Super. at 127.  He found only that plaintiff's wife was disturbed by defendant's conduct and that it was necessary to stop defendant from sending emails and texts.  Such conduct hardly amounts to the type of fear contemplated by both the statute and Silver.  See ibid.; see also N.J.S.A. 2C:25-29(a)(2) (identifying "[t]he existence of immediate danger to person or property" as a factor).

Reversed.  The matter is remanded to the trial court to vacate the FRO and the award of counsel fees.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5938-17T1